Ronald Clark O'BRYAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 59731.

Court of Criminal Appeals of Texas, En Banc.

· Sept. 26, 1979.

Rehearing En Banc Denied Oct. 24, 1979.

Marvin O. Teague and Richard E. Harrison, Houston (Court appointed), for appellant; Will Gray, Houston, of counsel.

Carol S. Vance, Dist. Atty., Clyde F. DeWitt, III, Michael Hinton and Vic Driscoll, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W. C. DAVIS, Judge.

This is an appeal from a conviction for capital murder, V.T.C.A. Penal Code, Sec. 19.03(a)(3). The jury answered affirmatively the special issues submitted pursuant to Article 37.071, Vernon's Ann.C.C.P. and, accordingly, punishment was assessed at death. Appellant was convicted of the murder of his eight year old son, Timothy, for remuneration or the promise thereof, namely, the proceeds from a life insurance policy on the life of Timothy.

The record reflects that appellant and his family[1] had leased a townhouse in Deer Park, a suburb of Houston. By trade, appellant was an optician; in the past, he had been involved in the insurance business and had worked for a chemical company. At the time of the offense, appellant was employed by Texas State Optical (TSO) earning a "take-home" salary of approximately $150 per week.

The record reflects that appellant had serious personal financial problems. Prior to moving into the townhouse, appellant sold the family residence and applied the $6,000 in proceeds to the most pressing obligations.[2] These financial difficulties cumulated to the point that in October of 1974, appellant's take-home salary was virtually consumed by rent, car payments, and grocery expenses. Still, appellant owed "GAC" about $2,000 on a delinquent loan and another $800 to the "government." He was eight months behind on his $149 per month car payments and had received a letter threatening repossession. Appellant openly discussed his financial burdens, and had attempted to borrow $100 from an associate. The Medical and Dental Service Bureau refused appellant a loan in the amount of $1,750.

Contemporaneous with these financial problems, appellant acquired several life insurance policies covering his children. In January of 1974, appellant joined the "New Outlooks Club" at Pasadena State Bank, which entitled him to a small amount of life insurance by virtue of automatic withdrawals of a few dollars per month. Each member of appellant's family signed the signature card at the bank and therefore each was covered by a $10,000 life insurance policy under the "New Outlooks Club" plan. Appellant's wife protested the action because she felt even the small premium would be an unnecessary strain on the family's already tight budget. She also expressed her feelings that life insurance on the children was an unnecessary expense. In late September or early October, appellant ignored the advice of his life insurance agent and purchased $20,000 life insurance policies on each of his children. These policies were purchased without the knowledge of appellant's wife. By mid-October, both of appellant's children were covered by several life insurance policies, while appellant had very little or no coverage himself.

In August of 1974, appellant requested that the manager of TSO obtain some cyanide to use in cleaning gold glass frames. The request was unusual because cyanide had not been used in the optical business for over twenty years. About three weeks later appellant repeated the request and was referred to persons with more authority than the branch manager.

In early September, appellant telephoned a friend, Bobby Terry, employed by Arco Chemical Company. He and appellant had

---

1. Appellant's family consisted of himself, his wife, a daughter (Elizabeth) and his son (Timothy).

2. The record indicates that appellant's indebtedness was between $20,000 and $100,000.

at one time worked together at Arco Chemical Company. Appellant told Terry that he was taking a chemistry course at San Jacinto College [3] and felt that his instructor was not familiar with the numerous types of cyanide. Appellant and Terry then discussed the varieties of cyanide and the availability of the chemical. Appellant then inquired where cyanide might be purchased and Terry referred him to several area chemical companies, including Curtin Matheson Scientific Co. Finally, under the guise of "curiosity," appellant inquired about fatal human doses of cyanide, along with the procedures used to detect unknown chemicals in the body of a deceased person.

Appellant continued to discuss cyanide among his fellow employees at TSO. These discussions ranged from the use of cyanide in the optical business to the fatal human dosage of the chemical.

Prior to Halloween of 1974, appellant appeared at Curtin Matheson Scientific, a chemical outlet in Houston. Appellant informed salesperson David Lee Jackson that he wanted to purchase a small amount of cyanide. The smallest amount of cyanide available was a five-pound container, which appellant rejected as too large. Appellant and Jackson then discussed other sources for small amounts of cyanide before appellant departed.

Immediately preceding Halloween of 1974, appellant discussed purchasing a home, with his friend, Jimmy Bates. The discussion included prices and availability and ended with a request from appellant that Bates not inform appellant's wife of the discussion. On October 23, 1974, appellant informed the Medical Branch Credit Union that he expected a large sum of money before the end of 1974 and signed an agreement extending arrearages on the note to January 1, 1975. Further, appellant informed a co-worker of his intention to quit his job at TSO on November 15th. Appellant's wife was unaware of these activities and she testified that she had no reason to expect a large sum of money before the end of the year.

About two weeks prior to Halloween, appellant brought home "trick or treat" costumes for his two children. He appeared very excited about taking the children "trick or treating," although he had never been particularly excited about Halloween in the past. Approximately one week before Halloween, appellant and Jimmy Bates agreed that appellant and his family would come to the Bates' home for dinner on Halloween, then the children from both families would "trick or treat" together.

On Halloween, Thursday, October 31, 1974, one of appellant's customers at TSO observed appellant in the parking lot of the shopping center where TSO is located. Appellant was carrying a stapler and a bag with unknown contents. Later, that same day, the customer's glasses were serviced by appellant. A conversation between appellant and the customer included a discussion of lethal amounts of cyanide.

After work, appellant went to the home of Jimmy Bates. As planned, appellant's family had arrived earlier and upon appellant's arrival, both families sat down to dinner. After dinner, appellant and Bates were to take the children "trick or treating" in the neighborhood surrounding the Bates' home. However, the weather turned bad and by the time dinner was over, rain was falling.

The rain caused some modification in the plans for "trick or treating." One of the Bates' children decided not to participate, leaving only three children, including Timothy, the deceased, to go. Because of the rain, "trick or treating" was limited to only two streets (Citation Street and Donerail Street) and several homes were not visited for a variety of other reasons.

The group that set out from the Bates home on Halloween night included Bates and one of his children and appellant, along with both of his children. Earlier, a plan

---

3. The record reflects that appellant had not been enrolled in a college level course since his college undergraduate studies.

was developed, whereby Bates would remain on the sidewalk while appellant accompanied the children to the doors of the homes to request treats. At 4112 Donerail, the home of Courtney and Carolyn Melvin, appellant accompanied the children to the door while Bates remained on the sidewalk. When no one answered the door at 4112 Donerail, the children ran to the next home. Appellant, however, remained behind in the darkness for about thirty seconds. Bates saw no one answer the door at 4112 Donerail, but observed appellant holding at least two "giant pixy styx" candies [4] as he departed this address. Appellant left the porch area "switching" the candy through the air exclaiming that the "rich neighbors" were handing out expensive treats. One giant pixy styx was briefly distributed to each child; appellant then took the candy back and redistributed them when the group returned to the Bates' residence. One giant pixy styx was given to each child present, including the child that had not gone with the group. A fifth giant pixy styx was given to a child who "trick or treated" the Bates' residence when he told appellant that he went to his church.

With the evening's activities completed, appellant took the children home while his wife stopped off at the home of a friend. Appellant readied the children for bed and they then requested some of the Halloween candy. Timothy elected to eat some of his giant pixy styx. After taking one gulp of the candy from the giant pixy styx, Timothy encountered difficulty in getting the candy out. Appellant took the candy and rolled it between his hands to loosen it. Timothy took a second gulp and complained that the candy tasted bad.[5] Appellant gave Timothy some Kool-Aid to wash the bad taste out of his mouth. After drinking the Kool-Aid, Timothy got sick, and went into the bathroom, where he started vomiting. Appellant held Timothy up by the waist as Timothy became sicker and then went into convulsions.

An ambulance was summoned by appellant. Timothy was taken by ambulance to a local hospital where he died within an hour. Fluids aspirated from Timothy's stomach at the hospital contained 16 milligrams of cyanide and a blood test showed the level of cyanide in the blood to be .4 milligrams. A fatal human dose of cyanide is a blood level between .2 and .3 milligrams of cyanide.

Twice, while attempting to explain the events to ambulance attendants, appellant claimed he was ill and went to the bathroom. However, he refused treatment. Appellant told police that the giant pixy styx had come from a home in the same subdivision as the Bates home.

During the days following Halloween, appellant gave conflicting stories concerning the origin of the giant pixy styx. Finally, he directed police to a home on Donerail, giving a general description that fit Courtney Melvin of 4112 Donerail as the person who had given out the candy. Appellant was "almost positive" that Courtney Melvin was that person who had given out the candy when he saw Melvin standing in a crowd.

However, other testimony showed that on Halloween Courtney Melvin had left home for work at 1:30 p. m. He worked until 10:30 p. m. and returned home to 4112 Donerail by 10:45 p. m. No "trick or treaters" called after 10:45 p. m. Mrs. Melvin and the Melvin children "treated" visitors until they ran out of treats at 6:45 p. m. After that time, they did not answer the door. Mrs. Melvin did not see appellant or Jimmy Bates or any of the children they accompanied. Further, no giant pixy styx were handed out by the Melvins. The record reflects that investigation failed to produce a source of giant pixy styx on the entire route followed by Timothy O'Bryan.

Police recovered all five giant pixy styx and turned them over to Dr. Jachimczyk, a

---

4. Giant pixy styx are plastic straws approximately 18 inches in length, filled with a sugar-based powdered candy and heat-sealed at both ends.

5. There is some evidence that appellant actually poured the candy from the pixy styx into Timothy's mouth.

medical examiner. Dr. Jachimczyk had performed the autopsy on Timothy and determined the cause of death to be cyanide poisoning. A physical examination of the giant pixy styx showed that while one end of the candy was properly heat-sealed, the other end was sealed by means of a staple. A representative from the company that manufactures giant pixy styx testified that the plastic straw containing the candy was always heat-sealed and never stapled. Further examination showed that the giant pixy styx from which Timothy had eaten was missing the first four inches of candy. A chemical test for cyanide in this giant pixy styx produced a negative result. However, the remaining four pixy styx, when tested for cyanide, all had a fatal dose of the chemical in the first two inches of candy.

On November 1st, appellant discussed funeral plans with a funeral director. Appellant was informed that a separate death certificate was required to claim under each insurance policy. Appellant ordered six death certificates.

Appellant openly discussed his plans for the proceeds from the insurance policies. Further, there was testimony that although he appeared grief-stricken in public, privately, appellant did not demonstrate emotional shock. In a conversation with Jimmy Bates, appellant stated that he didn't see how "they can pin [Timothy's death] on anybody."

In a search of appellant's residence, police discovered a pair of scissors and a knife. The blades of the scissors had a lavender plastic substance on them and an undetermined purplish stain. The knife blade was also coated with the wax or plastic substance and had clear crystal particles that were water soluble and contained sugar. This material appeared similar to that in a giant pixy styx, but a comparison test failed to match the substances positively.

Appellant testified in his own behalf and denied all guilt. Other witnesses testified that appellant's reputation for truth and veracity was bad.

Appellant's first ground of error directs us to the action of the trial court in sustaining the state's challenge for cause to three prospective jurors. Appellant claims that veniremen Wells, Pfeffer and Bowman were excused in violation of the doctrine of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). In *Witherspoon,* the Supreme Court of the United States stated:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed *or recommended* it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected."

The Court further stated:

"Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position."

In *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976), the Court reaffirmed the *Witherspoon* doctrine and held that no death penalty can stand if a single venireman is excluded in violation of that doctrine. See also, *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Maxwell v. Bishop,* 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970); *Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969).

During the voir dire examination of prospective jurors, Charles D. Wells, a minister, stated without equivocation that he opposed the death penalty. During an examination by the court, the following exchange occurred:

"EXAMINATION BY THE COURT

"Q. Mr. Wells, let me ask you a question before they have the right to ask you questions.

Because of your moral or religious scruples would you, if you were a member of the jury, would you au-

tomatically vote against the imposition of capital punishment no matter what the trial revealed?

"A. As far as the electric chair is concerned?

"Q. Would you personally, if you were a member of a jury, would you automatically vote against the imposition of the death penalty no matter what the trial revealed?

"A. Yes, I would.

"Q. All right.

"A. I would vote against it."

Following this questioning by the court, appellant's counsel posed a question to Wells:

". . . Now, are you saying at this time that under no circumstances, regardless of what the testimony would be, under no circumstances could you vote for the death penalty."

Wells responded:

"I don't think there are any that I possibly could vote for the death penalty."

Venireman Wells clearly and unambiguously expressed opposition to the death penalty. His responses to questions asked of him in voir dire reveal that he opposed the death penalty to the extent that he would vote against death as a penalty, regardless of the facts in the case. Such deep seated and unyielding resolve to vote against the death penalty brought Wells within the narrow classification of veniremen discussed in *Witherspoon.* The fact that Wells stated that he could truthfully answer the special issues submitted at the punishment hearing pursuant to Article 37.071 is not dispositive of appellant's claim. Here, venireman Wells took an open and unambiguous position against the infliction of death as a penalty. He was not excused in violation of *Witherspoon.*

Venireman Pfeffer was, at first, equivocal in stating his position on capital punishment. He described himself as a "borderline thinker" on the issue of capital punishment, and expressed doubt that he could make the proper judgment because of his "mixed feelings" concerning the inflic-

tion of death as punishment. However, as the voir dire of venireman Pfeffer continued, his conviction against the infliction of the death penalty became obvious and he finally expressed a firm resolve to vote against capital punishment in responding to a question from the court:

"You yourself are in such a frame of mind that regardless of how horrible the facts and circumstances are that you would automatically vote against the imposition of the death penalty? Is that correct?"

Venireman Pfeffer responded:

"Well, if it says a yes or not, I would have to say yes, I would automatically vote against, to give a correct answer."

A continued examination further reflects that while Pfeffer may have been slow to reach his conviction to vote against capital punishment, once he reached that conviction, he was unbending in his resolve to vote against the death penalty. This resolution is best illustrated by Pfeffer's responses to questions from appellant's counsel.

"Q. All right. Now, when (the State) was talking with you, you indicated that based upon the facts and based upon the evidence that would be produced here, that you could consider the death penalty. Is that correct, sir?

"A. I believe I stated that—to make a direct answer, I would have to say no. I believe this is what I stated.

"Q. But what you're saying then is, under no circumstances, under no circumstances—you see, nobody is asking you to give the death penalty. Nobody is asking you to do that today. You understand that?

"A. Right, I understand.

"Q. Then, under no circumstances could you even consider the death penalty. Is that what you're saying sir, under the worst circumstances you can possibly imagine?

"A. Well, I think I answered that at the present time with a yes or no an-

swer, I said no. I would not consider it, is what I—

"Q. Under the worst kind of circumstances you couldn't possibly consider the death penalty?

"A. Well, to get a direct answer at the present time, I said no.

"Q. Well, sir—

"MR. HINTON: We're going to object to him asking the question again, Your Honor. He's asked it three times. The gentleman has answered it three times.

"MR. HARRISON: I don't think the juror quite understands what I'm trying to ask, Your Honor. I'm only trying to find out if he can consider the death penalty under any circumstances?

"THE COURT: He said no three times. Do you want to ask him one more time? I will allow you to ask the question one more time, but I believe he stated no."

Such a resolve to vote against the death penalty places this venireman within the category of prospective jurors which may be excluded for cause under *Witherspoon,* supra.

■ Like Pfeffer, venireman Bowman was at first somewhat unsure of his personal convictions concerning the infliction of the death penalty, and of his ability to consider the death penalty under the appropriate facts. Bowman agreed that guilty persons should be punished, but he held serious doubts as to his ability to assess capital punishment.

Towards the end of Bowman's voir dire examination, he was asked by the State:

"Q.  .  .  . And I take it by your answer that in every case, no matter how serious it was, you as a juror could (sic) automatically exclude consideration of the death penalty and would in every case turn to some other form of punishment, whether it be life confinement or 99 years or whatever?

"A. I think that's true."

Further examination of venireman Bowman by appellant's counsel revealed that he would be able to consider the death penalty in one severely limited situation.

"Q. All right. And all we want to know at this time—we don't want you to give anybody life or death or find anybody guilty. We're trying to find out how you feel. You said you doubted seriously if you could give the death penalty. You doubted seriously. Then sir, my questions would be, could you consider the death penalty. Could you consider the death penalty?

"A. Well, if I could consider it, it seems to me like I would be willing to do it. I don't think that I would be willing to condemn a man to death.

"Q. Well, that doesn't quite answer the question, sir.

Can you think of any circumstances, any circumstances—and remove this case from you mind if you could.

"A. Uh-huh.

"Q. Can you think of any circumstances where you could possibly consider the death penalty? It doesn't mean you have to give it. Nobody is asking you to vote for it. Could you consider it?

"A. I think I could only consider it if it was closer to home to me.

"Q. Well, no. All I'm asking, sir, is if you could conjure up in your mind, if you could think of some circumstances, could you consider giving the death penalty? I'm not talking about—

"A. No, sir. I couldn't.

"Q. Even if it was closer to home?

"A. It (sic) it was closer to home, I could.

"Q. All right. Then, you could consider it?

"A. Yes.

"Q. All right.

THE COURT: What do you mean by closer to home?

JUROR BOWMAN: If it was one of my family.

THE COURT: Well, if it was one of your family, you couldn't be a juror in that case.

MR. HARRISON: I understand that, Your Honor, but Mr. Bowman has said he could consider it in some case.

THE COURT: Well, you have to understand the circumstances of a case where he could be a juror. He can't be a juror if it's a member of his family.

MR. HARRISON: I understand that, but I asked the question, could he conjure up in his mind, consider it, just consider it.

THE COURT: That's an improper question because he couldn't consider it, because he couldn't be a member of the jury."

From this examination, it is apparent that venireman Bowman could consider capital punishment only if the victim of the crime were a member of his family. In such a circumstance, venireman Bowman would be unable to serve as a juror because of his interest and prejudice in the case. Article 35.16, Vernon's Ann.C.C.P. The ability to consider capital punishment as a tool of vengeance by a person aggrieved by the loss of a family member is surely not within the contemplation of *Witherspoon.* No other group would be more predisposed to vote for capital punishment than a jury composed of surviving members of the deceased victim's family. The situation in which Bowman could consider the imposition of death as a penalty is the situation which *Witherspoon* proscribes—the imposition of the death penalty by a "hanging jury."

The voir dire of Bowman revealed that he would not vote for capital punishment in a case where he was otherwise qualified to sit as a juror. In those situations, Bowman was resolved to vote against capital punishment, regardless of the evidence produced. He was properly excused under *Witherspoon.*

■ In his second ground of error, appellant contends that the trial court erred in denying his challenge for cause to venireman Johnny Taylor, claiming that prior to trial Taylor had already formed an opinion as to appellant's guilt. After his challenge for cause was overruled, appellant used a peremptory challenge to strike venireman Taylor. However, appellant did not exercise all of his peremptory challenges, and there is no showing that he was forced to accept any juror whom he considered objectionable.

■ Under such circumstances, error is not preserved. In order to present reversible error, appellant must show that he was forced to exercise a peremptory challenge to excuse a prospective juror to whom his challenge for cause should have been sustained; he then must show that he exhausted his peremptory challenges, and was later forced to accept a juror whom he found objectionable. *Williams v. State,* 565 S.W.2d 63 (Tex.Cr.App.1978); *Hernandez v. State,* 563 S.W.2d 947 (Tex.Cr.App.1978); *Wolfe v. State,* 147 Tex.Cr.R. 62, 178 S.W.2d 274 (Tex.Cr.App.1944). Absent a showing that he was harmed, appellant's contention is overruled.

■ In his third ground of error, appellant complains that the trial court erred in limiting his voir dire examination of venireman Elbert Lambert, concerning Lambert's ability to consider probation as a possible punishment under appropriate circumstances.

After questioning from both the State and appellant, Lambert's answers concerning his ability to consider probation were still wavering and equivocal. At that point, Lambert was questioned by the court as follows:

"THE COURT: . . . [I]f finding somebody guilty of an offense of murder and taking into consideration all of the facts and circumstances involved, and let's assume for the sake of argument that the punishment was assessed by the jury at ten years or less and the

man . . . properly qualified for probation, could you if the facts and circumstances justified it recommend that his sentence be probated?

"A. Well, yes, sir. What I didn't understand—I mean, well—

THE COURT: We're not talking about this case.

"A. Well, no, sir, I know.

THE COURT: Okay.

"A. Okay, but now, he got into mercy killings and—

"THE COURT: Well, they're—all he was trying to do is show there are many, many ways that the crime of murder can occur. . . . That's why you have to consider the entire range of punishment and you have to have an open mind as to the entire range of punishment and you have to be able to consider the entire range of punishment and if you feel under the circumstances the facts justify it, could you and would you probate the sentence?

"A. Yes, sir.

      *     *     *     *     *     *

"Q. (Mr. Teague) * * * [T]here are many, many ways a person can be accused or charged with the offense of murder—

"THE COURT: He was just qualified in this area. Are you going to go back over the same area that we just got through going over?

"MR. TEAGUE: Judge, as to whether this person could in fact consider and recommend if he felt proper where the punishment is less than ten years or less—by virtue of Mr. Driscoll's questioning he's limited the situation to a unique and peculiar factual situation and we feel that we should be entitled to determine whether or not his viewpoints would be wide open as to any kind of murder.

"THE COURT: . . . The test is does he have any conscientious

objections against it and could he and would he do it.

"MR. TEAGUE: By virtue of the questioning he's been given a rather peculiar type of case, and I think the Legislature has left it up to the jury, and you can have the most cold blooded merciless murder in the world, and if the jury says it's ten years and they feel it right and proper, they can recommend probation. . . . And this is what I want to ascertain from Mr. Lambert, is whether or not—

"THE COURT: Well, I've ruled that he's qualified in this area."

■ As is apparent from the record, this limitation on voir dire was imposed after Lambert had finally committed himself to consider the full range of punishment, including probation. We hold that the trial court did not abuse its discretion in refusing to permit further inquiry in the matter. In *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr. App.1978), we reiterated that the trial court may impose reasonable restrictions on the exercise of voir dire examination. See *Emanus v. State*, 526 S.W.2d 806 (Tex.Cr.App. 1975); *Smith v. State*, 513 S.W.2d 823 (Tex. Cr.App.1974); *Lewis v. State*, 488 S.W.2d 740 (Tex.Cr.App.1972); *McCarter v. State*, 478 S.W.2d 524 (Tex.Cr.App.1972). Duplicitous questions may, within the court's discretion, be limited to curb the prolixity of what can become the lengthiest part of a criminal proceeding. *Bodde v. State*, supra.

In the instant case, Lambert stated that he could consider the full range of punishment, including probation. The trial court did not abuse its discretion in refusing to allow appellant to question him further in this area. See *Bodde v. State*, supra; *Ortega v. State*, 462 S.W.2d 296 (Tex.Cr.App. 1970); *Smith v. State*, supra. This ground of error is overruled.

■ In his fourth and fifth grounds of error, appellant attacks the constitutionality of Article 37.071(a), which provides that at the punishment phase of a capital murder trial,

".   .   . evidence may be presented as to any matter ·that the court deems relevant to sentence. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas."

Appellant contends that this portion of the statute relating to the admissibility of evidence constitutes an improper delegation of legislative authority to the judiciary, since it is a legislative function to enact rules of evidence. We do not agree that this statute delegates to the judiciary the authority to enact rules of evidence and criminal procedure.

A similar contention was addressed in *Brown v. State,* 554 S.W.2d 677 (Tex.Cr. App.1977). Therein, the capital defendant contended that Article 37.071 "confers upon the trial court standardless discretion in determining the evidence which may be presented as to any matter relative to sentence." We rejected this contention, and recognized that, pursuant to the statute, the trial judge does have limitations as to what evidence can be admitted.

Further, in *Porter v. State,* 578 S.W.2d 742 (Tex.Cr.App.1979) we reversed the defendant's capital murder conviction where certain evidence was improperly admitted at the punishment hearing. We stated:

"It is true that the trial court at the punishment phase of a capital murder trial has wide discretion in admitting or excluding evidence. (Citations omitted). *However, this discretion extends only to the question of the relevance of the facts sought to be proved. Article 37.071(a), supra, does not alter the rules of evidence insofar as the manner of proof is concerned."* (Emphasis added)

Still further, in *Rumbaugh v. State,* Tex.Cr. App., 589 S.W.2d 414 (1979), we recognized that certain exclusionary rules of evidence do apply at the punishment phase of· a capital trial, in interpreting the meaning of Article 37.071. See also, *Porter v. State,* supra; *Cortez v. State,* 571 S.W.2d 308 (Tex.Cr.App.1978).

Thus, we cannot agree with appellant's contention that this statute delegates to the trial courts the legislative function of enacting rules of evidence in capital trials.

■ Appellant's contention that Article 37.071 is invalid under the United States Constitution has been answered adversely to him in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). These two grounds of error are overruled.

■ In grounds of error six through eleven, appellant challenges Article 37.-071(b)(2), which provides:

"(b) On conclusion of the presentation of the evidence [at the punishment phase of a capital murder trial], the court shall submit the following issues to the jury:

\*        \*        \*        \*        \*        \*

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;"

Appellant contends that this statute permits the jury to act arbitrarily, based upon speculation and conjecture, and that the statute is unconstitutionally vague and in violation of due process. Such contentions have previously been considered and rejected. *Jurek v. Texas,* supra; *Collins v. State,* 548 S.W.2d 368 (Tex.Cr.App.1976); *Gholson v. State,* 542 S.W.2d 395 (Tex.Cr.App.1976); see also, *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In addressing this portion of the Texas death penalty procedure, the Supreme Court stated:

"It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a con-

victed person's probable future conduct. when it engages in the process of determining what punishment to impose." *Jurek v. Texas,* supra. The duty of the jury under Article 37.-071(b)(2) is basically "no different from the task performed countless times each day throughout the American system of criminal justice." *Jurek v. Texas,* supra. These contentions are overruled.

▆ Appellant next contends that the jury's determination of the probability that a capital defendant will commit future acts of violence, violates the separation of powers doctrine. See Article IV, Section 11; Vernon's Ann.Texas Constitution. He contends that a jury's determination of future conduct invades the province of the executive branch, specifically the executive clemency powers administered through the Texas Board of Pardons and Paroles. Appellant cites no authority in support of this argument, and we find that it is wholly without merit.

The authority of the Board of Pardons and Paroles extends only to persons who have been convicted of crimes and detained in institutions operated by the Department of Corrections. Article 42.12, Section 12, Vernon's Ann.C.C.P. Thus, the Board of Pardons and Paroles functions at a completely different stage in the criminal justice system than does a jury which finds facts at the punishment phase in a capital murder trial. Cf. *State ex rel. Smith v. Blackwell,* 500 S.W.2d 97 (Tex.Cr.App.1973). These grounds of error are overruled.

▆ In his thirteenth and fourteenth grounds of error, appellant contends that the trial court erred in admitting evidence of witness David Jackson's good reputation for veracity, as it was improper bolstering. We do not agree. The record reflects that Jackson testified that appellant had made an inquiry regarding the purchase of cyanide. Upon cross-examination, it was demonstrated that Jackson had twice previously testified under oath, and have given inconsistent testimony concerning dates, times, clothing descriptions of appellant and other facts.

In rebuttal, the State introduced the testimony of John Pace that he was familiar with Jackson's reputation for truth and veracity, and that it was such as would entitle him to be worthy of belief under oath.

In Texas Practice, Sec. 772, (McCormick & Ray, 2nd ed. 1956), the rule was succinctly stated that:

"[w]hen prior inconsistent statements have been used to impeach a witness, whether reputation for veracity may be given in support depends upon the view taken of this method of impeachment. If it be regarded as involving an attack upon the witness' veracity character, then good character is competent in support . . . [Texas] courts have adopted [this view] and admit evidence of good character for truth and veracity."

See also *Adams v. State,* 514 S.W.2d 262 (Tex.Cr.App.1974); see generally, *Hulin v. State,* 438 S.W.2d 551 (Tex.Cr.App.1969); *Brown v. State,* 475 S.W.2d 938 (Tex.Cr. App.1971).

In the instant case, Jackson was impeached as to several important matters by evidence of his prior inconsistent statements. Thus, evidence of his good reputation for veracity was admissible.

▆ Appellant further contends that the State did not lay the proper predicate for the introduction of this evidence, as there is no showing that Pace was familiar with the witness' reputation in the "community." The record reflects that Pace testified that he had been a business associate of Jackson's for five years, and that he was familiar with Jackson's performance at work and his reputation for truth and veracity "around the job." This witness, who had knowledge of Jackson's reputation for truth and veracity at his place of employment, was qualified to testify to such. *Loyd v. State,* 506 S.W.2d 600 (Tex.Cr.App. 1974); see also *Jordan v. State,* 163 Tex. Cr.R. 287, 290 S.W.2d 666 (1956); *Hayles v. State,* 507 S.W.2d 213 (Tex.Cr.App.1974). These grounds of error are overruled.

In his sixteenth ground of error, appellant contends that the trial court erred in permitting appellant's wife to testify against him in violation of Article 38.11, Vernon's Ann.C.C.P. This statute provides in part:

"The husband and wife may, in all criminal actions, be witnesses for each other, but except as hereinafter provided, they shall in no case testify against each other in a criminal prosecution. *However, a wife or husband may voluntarily testify against each other in any case for an offense involving any grade of assault or violence committed by one against the other or against any child of either under 16 years of age . . .*" (Emphasis added.)

Clearly, appellant's wife was competent to testify against appellant for the murder of their son, under the express exception to the statute. See *Ritchey v. State,* 407 S.W.2d 506 (Tex.Cr.App.1966). Cf. *Robinson v. State,* 457 S.W.2d 572 (Tex.Cr.App. 1970).

This statute does not, as appellant contends, require that the spouse-witness be an eyewitness to the assault on the child before the testimony is admissible. This ground of error is overruled.

In ground of error seventeen, appellant claims that the in-court identification of him by State's witness David Lee Jackson was tainted by and based on an impermissibly suggestive photographic display resulting in a substantial likelihood of misidentification. We do not agree.

Appellant attempted to suppress Jackson's in-court identification. Facts adduced during a pre-trial hearing show that two police officers contacted Jackson at his job with Curtin Matheson Scientific, a chemical outlet in Houston. The purpose of this investigation was to discover, if possible, the source of the cyanide discovered in the giant pixy styx candy. Jackson related that he remembered an individual coming to the company around Halloween and inquiring about cyanide. The officers then displayed a photograph of appellant and there followed a general discussion of appellant's physical appearance. Portions of this description were "furnished" by the officers, while some characteristics were first mentioned by Jackson. At the end of the conversation, Jackson could make only a tentative identification of appellant as the customer.

The record further reflects that Jackson conversed with this customer for a period of five to ten minutes in a well-lighted area from a distance of a few feet. Without hesitation, Jackson testified that his in-court identification was based on his observation of appellant in the conversation with him during October.

Following the hearing on the motion to suppress, the trial court entered the following findings:

". . . the defendant, was previously identified in court by the witness on November 11, 1974 . . . and that such identification was of independent origin and not tainted by any pre-trial photographic display."

The trial court further found:

". . . David Lee Jackson identified the defendant . . . before this Court at this hearing and that such identification was independent of any pre-trial view of any photograph of said defendant. In this regard, and under *Thompson v. State,* [Tex.Cr.App.] 480 S.W.2d 624, the Court bases this finding of independent origin upon the following factors: (a) that the said witness had some ten (10) minutes to observe said defendant at the Curtin-Matheson store under good lighting conditions, and that on the same occasion, there was conversation between the witness and the defendant; (b) As stated above, the description of the accused during the conversation between officers and said witness, parts of which were initiated by the witness, are identical to the defendant's actual description; (c) the witness has not identified any other person as a person who attempted to buy cyanide at his store at or about the time in question; (d) the witness was unable to identify the picture of the accused presented to him by police officer,

but was able to make a positive identification only upon confronting said witness in Court on November 11, 1974 and again on January 13, 1975; (e) that there was no failure to identify the defendant at any prior line-up, photographic or in person, other than the failure to identify the defendant's photograph as initially presented by police officers; and (f) there was no appreciable lapse of time between the alleged attempt to purchase cyanide and the in-Court identification at the Habeas Corpus hearing on November 12, 1974, and again before this Court on January 13, 1975."

Since the record supports the trial court's findings that Jackson's in-court identification was based on his independent view of appellant and not upon the photographic display, this ground of error is overruled. *Bermudez v. State,* 533 S.W.2d 806 (Tex.Cr. App.1976); *Clay v. State,* 518 S.W.2d 550 (Tex.Cr.App.1975); *Thompson v. State,* 480 S.W.2d 624 (Tex.Cr.App.1972).

In his eighteenth ground of error, appellant contends that the trial court erred in refusing his specially requested charge to the jury prior to their deliberations on punishment. This charge contained an explanation of the parole process and the function of the Board of Pardons and Paroles, and then instructed the jury not to consider in their deliberations parole or whether appellant might be paroled at some date in the future.

▮▮▮ We hold that the trial court did not err in refusing to submit this charge to the jury. The matter of parole or a defendant's release thereon is not a proper consideration for a jury's deliberations on punishment. See *Moore v. State,* 535 S.W.2d 357 (Tex.Cr.App.1976); *Rios v. State,* 510 S.W.2d 326 (Tex.Cr.App.1974); *Howard v. State,* 505 S.W.2d 306 (Tex.Cr.App.1974); cf. *Shippy v. State,* 556 S.W.2d 246 (Tex.Cr. App.1977); *Freeman v. State,* 556 S.W.2d 287 (Tex.Cr.App.1977). This is also true in a capital case where the jury's task at the punishment stage is to answer the special issues. See *Freeman v. State,* supra; see also *Shippy v. State,* supra, wherein we held that a specially requested instruction relating to the second special issue at the punishment stage of a capital trial would have constituted a comment on the weight of the evidence. Further, the giving of an admonitory instruction in order to guard against the jury's consideration of parole is largely left to the trial court's discretion. *Freeman v. State,* supra; *York v. State,* 566 S.W.2d 936 (Tex.Cr.App.1978); *Williams v. State,* 511 S.W.2d 64 (Tex.Cr.App.1974); *Hernandez v. State,* 169 Tex.Cr.R. 418, 334 S.W.2d 299 (1960). We decline to adopt the view advanced by appellant, as articulated in *People v. Morse,* 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33 (1964), that a jury should be charged on the law of parole and then instructed not to consider the same. This ground of error is overruled.

▮▮▮ In his nineteenth ground of error, appellant contends that the trial court erred in allowing the State to introduce into evidence the autopsy report on the deceased. The autopsy report, prepared by Dr. Jachimczyk, contained substantially the same matters as those testified to by Dr. Jachimczyk previously. Thus, appellant cannot complain of these. Cf. *Crocker v. State,* 573 S.W.2d 190 (Tex.Cr.App.1978); *Hughes v. State,* 562 S.W.2d 857 (Tex.Cr.App.1978); *Cain v. State,* 549 S.W.2d 707 (Tex.Cr.App. 1977). The admission of any additional matters contained in the report relating to autopsy protocol was harmless. This ground of error is overruled.

In four grounds of error, appellant complains of argument by the prosecutor at the punishment stage of the trial.[6] The record reflects that the prosecutor argued:

"People that know this individual and know him well told you he is not worthy of belief under oath. He has a bad reputation for truth and veracity. You didn't hear any of the witnesses that he called say anything about his reputation in the

---

6. In two of these grounds, we are asked to consider the error as fundamental. We decline to do so.

community for being a peaceful and law-abiding citizen, or for being a person of truth and veracity. No, and they weren't asked that question by these defense lawyers because those witnesses would have told you the truth in that respect. *They have a moral obligation, if, in fact, this defendant has a good reputation in his community for being a peaceful citizen, a law-abiding citizen, a citizen of truth, a citizen of veracity, to come in here and bring you those witnesses, and there are none.*"

"MR. TEAGUE: . . . [W]e would object to counsel for the State trying our case. We strongly—besides that, Your Honor, it's not our burden to bring any evidence into this courtroom. . . . We would therefore object to Counsel for the State's argument, the last statement.

"THE COURT: *He may comment on the failure to call certain witnesses.* I'll overrule." (Emphasis added)

"MR. TEAGUE: Please note our exception."

█ It is well settled that the prosecutor, in argument, may comment upon the defendant's failure to call certain witnesses. *Carrillo v. State*, 566 S.W.2d 902 (Tex.Cr. App.1978); *Torres v. State*, 552 S.W.2d 821 (Tex.Cr.App.1977); *Kerns v. State*, 550 S.W.2d 91 (Tex.Cr.App.1977); *Beal v. State*, 520 S.W.2d 907 (Tex.Cr.App.1975); *Thomas v. State*, 519 S.W.2d 430 (Tex.Cr.App.1975); *Mutscher v. State*, 514 S.W.2d 905 (Tex.Cr. App.1974); *Fisher v. State*, 511 S.W.2d 506 (Tex.Cr.App.1974); *Winkle v. State*, 506 S.W.2d 891 (Tex.Cr.App.1974).

█ We do not find that this argument, or the trial court's response to the defense objection, shifted the burden of proof.

█ Clearly, the State has the burden of proof beyond a reasonable doubt. *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); Article 38.03, Vernon's Ann.C.C.P.; *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr.App.1978) (on Motion for Rehearing). At the punishment phase of a capital murder trial, the State must prove each special issue submitted beyond a reasonable doubt. Article 37.071(c).

As the Supreme Court recognized in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), "the constitutionality of the Texas [death penalty] procedures turns on whether the [special issues] allow consideration of particularized mitigating factors," when the jury deliberates on punishment. The Court recognized that the capital jury need be allowed to fully consider why the death penalty should *not* be imposed as well as why it should be. The Court stated that the second special issue will allow a capital defendant to bring to the jury's attention "whatever mitigating circumstances *he may be able to show* . . . ." (Emphasis added).

█ Thus, while the burden of proof of the special issues under Article 37.071, supra is upon the State, the option of producing and coming forward with mitigating circumstances is upon the capital defendant.

In the instant case, appellant called several witnesses who testified regarding the probability of future acts of violence by appellant. Appellant's reputation and character, both relevant to punishment, were not the subject of inquiry by the defense.

█ The failure to call certain witnesses to elicit certain evidence is fair comment for both the State and the defense. Appellant, during argument, emphasized the failure of the State to call witnesses at the punishment phase. The State, in a similar manner, argued the failure of appellant to call witnesses to testify to his good character and reputation, and his failure to elicit such evidence from the witnesses which he did call.

The jury was properly charged on the State's burden of proof beyond a reasonable doubt at the punishment phase of the trial. The prosecutor's remarks did not shift the burden of proof to appellant, and the trial court did not err in its ruling or in stating the reason therefor.

These grounds of error are overruled.

In his twelfth ground of error, appellant contends that the evidence is insufficient to support the jury's finding that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Article 37.071(b)(2), Vernon's Ann.C.C.P.

It is well settled that in assessing punishment, the jury may consider all of the evidence adduced at trial on guilt or innocence. *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978); *Felder v. State*, 564 S.W.2d 776 (Tex.Cr.App.1978); *Brock v. State*, 556 S.W.2d 309 (Tex.Cr.App.1977); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App. 1977); *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr.App.1977); *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976).

Indeed, the circumstances of the capital offense may furnish *greater* probative evidence of the probability of future acts of violence than any other evidence relevant to the second special issue. See *Duffy v. State*, supra; *Brock v. State*, supra; *Burns v. State*, supra; *Shippy v. State*, supra.

The calculated nature of appellant's acts and the forethought with which he coldly planned and executed his crime is certainly probative evidence of his propensity to commit future acts of violence. See *Brooks v. State*, Tex.Cr.App. (No. 60,521, delivered March 21, 1979); *Earvin v. State*, Tex.Cr. App., 582 S.W.2d 794 (1979); *Felder v. State*, 564 S.W.2d 776 (Tex.Cr.App.1978); *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr. App.1978); cf. *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978).

A more calculated and cold-blooded crime than the one for which appellant was convicted can hardly be imagined. Appellant murdered his child in order to collect life insurance money. The record reflects *months* of premeditation and planning. As Halloween neared, he took out new and additional life insurance policies on *both* of his children, made his diligent and successful search for the poison which he was to use, set up plans to insure that he would take his children "trick or treating," bought the children their costumes, and even began making plans to spend the money which he would collect upon the deaths of his children. Well before the carefully planned and executed murder, appellant began to consider buying a new house, paying off his debts, and even quitting his job.

As this Court has previously stated, the circumstances of the capital offense itself, if severe enough, can be sufficient to sustain an affirmative finding to the second special issue. *Brooks v. State*, Tex.Cr.App. (No. 60,521, delivered March 21, 1979); *Muniz v. State*, 573 S.W.2d 792 (Tex. Cr.App.1978); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977). Even though this is true, we need not rely solely upon the facts of the capital offense for which appellant was convicted; the record reflects more.

Appellant, in order to execute his plan to murder his son and to collect the life insurance proceeds, and to escape detection in doing so, was willing to and attempted to commit murder four more times. When he intentionally distributed the four additional poisoned pixy styx to the other children, the likely and predictable result of his acts was to cause their deaths also. The lives which appellant was willing to sacrifice in order to carry out the murder of his son included those of the two children of his good friend Jimmy Bates, and another child who attended appellant's church, and his own daughter, whose life was also heavily insured. Thus, the jury had before it evidence of appellant's willingness to murder the four other children, in addition to the deceased, in order to carry out his scheme. These extraneous offenses were certainly probative of his propensity to commit future acts. See *Garcia v. State*, 581 S.W.2d 168 (Tex.Cr.App.1979); *Hammett v. State*, 578 S.W.2d 699 (Tex.Cr.App.1979); see also, *Gholson and Ross v. State*, 542 S.W.2d 395 (Tex.Cr.App.1976); *Von Byrd v. State*, 569 S.W.2d 883 (Tex.Cr.App.1978); *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr.App.1978).

In addition, the jury had before it evidence that appellant's crime was motivated solely by financial gain. Further, it was committed after the opportunity for months of reflection; the evidence reflected that

this was no crime of passion, nor was this murder committed as an afterthought while appellant was in the course of committing another felony offense, such as robbery or burglary.[7] This was certainly probative of appellant's propensity to commit future acts of violence, as it reflects upon this individual's state of mind.

There was no evidence that appellant was under the influence or domination of anyone else when he committed the instant offense; we have previously stated that this is probative evidence on special issue number two. *Duffy v. State*, supra; *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978); *Robinson v. State*, 548 S.W.2d 63 (Tex.Cr. App.1977); *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr.App.1975). Although appellant was having serious financial problems prior to his commission of the offense, the jury could conclude that this was not sufficient mental or emotional pressure to mitigate his actions. We have previously stated that the presence or absence of such pressure is probative on special issue number two. *Duffy v. State*, supra; *Hovila v. State*, supra; *Robinson v. State*, supra; *Jurek v. State*, supra.

The record does not reflect that appellant had a prior criminal record. However, we have previously recognized that the existence of a prior criminal record is not essential to a jury's finding that a capital defendant would constitute a continuing threat to society. See *Earvin v. State*, supra; *Adams v. State*, 577 S.W.2d 717 (Tex. Cr.App.1979).

The jury also had before it evidence of appellant's attempt to implicate another for the poisoning death, by a positive identification of another man as the source of the candy, when the evidence showed that this could not have been true.

Further, the jury had before it evidence of appellant's attitude toward his crime. There was testimony that he was "excited" by widespread news coverage of his son's death. There was also various testimony concerning the disparity between appel-

lant's public displays of grief over his son's death and his behavior when the circumstances were more private. The jury also heard testimony that at approximately 9:00 a. m. on November 1, the morning after his son's death the previous night, appellant called his life insurance agent to find out how to collect the proceeds of the policy on his son. At approximately 9:30 a. m. this same morning after his son's death, he inquired at his bank about collecting on a policy there, also. Further, over the next several days, appellant openly discussed how he would use the proceeds of the life insurance; these plans included taking an extended vacation.

By his entire conduct, including the facts that appellant, in such a deliberate and calculated way, took the life of his own child for money and jeopardized the lives of four others, the jury could have concluded that appellant had a wanton and callous disregard for human life; the evidence is sufficient for the jury to have found that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. See and compare *Brooks v. State*, supra; *Earvin v. State*, supra; *Starvaggi v. State*, Tex.Cr.App., 593 S.W.2d 323 (1979); *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App. 1978); *Adams v. State*, supra; *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr.App.1978); *Duffy v. State*, supra.

This ground of error is overruled.

The judgment is affirmed.

CLINTON, J., dissents to disposition of 12th ground of error.

7. See, e.g., *Earvin v. State*, supra; *Duffy v. State*, supra; contrast *Warren v. State*, supra, wherein the capital defendant shot the resident who surprised him while burglarizing the residence.