**Ronald Clark O'BRYAN,
Petitioner-Appellant,**

v.

**W. J. ESTELLE, Jr., Director, Texas
Department of Corrections,
Respondent-Appellee.**

No. 82–2422.

United States Court of Appeals,
Fifth Circuit.

Oct. 27, 1982.

Dissenting Opinion Oct. 28, 1982.

Stanley G. Schneider, Houston, Tex., Will Gray, Simonton, Tex., for petitioner-appellant.

Leslie A. Benitez, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before GEE, RANDALL and TATE, Circuit Judges.

PER CURIAM:

Petitioner, Ronald Clark O'Bryan, was convicted of capital murder in Harris County, Texas and sentenced to die. The evidence at trial indicated that he had killed his eight year old son on Halloween by giving him cyanide candy, in order to collect insurance proceeds. Petitioner's direct appeal was affirmed in an extensive opinion by the Texas Court of Criminal Appeals in *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr. App.1979), *cert. denied,* 445 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980). His two state court applications for habeas corpus relief were denied on July 31, 1980 and September 1, 1982.

In September, 1982, the state trial court set Petitioner's execution date for October 31, 1982. On September 29, 1982, Petitioner filed an application for a writ of habeas corpus and an application for a stay of execution in the United States district

court. On October 20, 1982, the district court denied the application for federal habeas relief, as well as the request for a stay. The district court found all of the Petitioner's contentions to be without merit. On October 25, 1982, Petitioner filed a notice of appeal to this court of the district court's judgment denying him habeas relief.

Petitioner now requests that we enter an order staying his October 31 execution date in order to permit him to pursue his appeal and that we grant him a certificate of probable cause to appeal. The State urges us to deny the request and to order briefs and argument before October 27 so that we may render a decision on Petitioner's appeal before October 31. For the reasons set forth below, we have decided to grant the stay of execution and a certificate of probable cause to appeal. In recognition of the State's legitimate interest in bringing this already drawn out proceeding to a close, we order that the appeal be expedited and direct the Clerk to establish an expedited briefing schedule.

■ In general, a court, in deciding whether to issue a stay, must consider:

(1) whether the movant has made a showing of likelihood of success on the merits, (2) whether the movant has made a showing of irreparable injury if the stay is not granted, (3) whether the granting of the stay would substantially harm the other parties, and (4) whether the granting of the stay would serve the public interest.

*Ruiz v. Estelle,* 666 F.2d 854, 856 (5th Cir. 1982) (*Ruiz II*) (quoting *Ruiz v. Estelle,* 650 F.2d 555, 565 (5th Cir. 1981) (*Ruiz I*)). *See also Florida Businessmen For Free Enterprise v. City of Hollywood,* 648 F.2d 956, 957 (5th Cir. 1981); *Drummond v. Fulton County Department of Family and Children's Services,* 532 F.2d 1001, 1002 (5th Cir. 1976). While "the movant need not *always* show a 'probability' of success on the merits," he must "present a substantial case on the merits when a serious legal question is involved and show that *the balance of the equities,* [i.e., the other three factors] *weighs heavily in the favor of granting the*

*stay." Ruiz II,* 666 F.2d at 856 (emphasis in original) (quoting *Ruiz I,* 650 F.2d at 565).

■ In a capital case, the possibility of irreparable injury weighs heavily in the movant's favor. The irreversible nature of the death penalty must be weighed against the fact that "[t]here must come a time, even when so irreversible a penalty as that of death has been imposed upon a particular defendant, that the legal issues in the case have been sufficiently litigated and relitigated so that the law must be allowed to run its course . . . ." *Evans v. Bennett,* 440 U.S. 1301, 1303, 1306, 99 S.Ct. 1481, 1482, 1484, 59 L.Ed.2d 756 (1979) (Rehnquist, J., granting a stay of execution). In a capital case, we must be particularly certain that the legal issues "have been sufficiently litigated," and the criminal defendant accorded all the protections guaranteed him by the Constitution of the United States. *See Shaw v. Martin,* 613 F.2d 487, 491 (4th Cir. 1980).

■ A defendant "is given the right to seek review in the federal courts of claims based upon our national Constitution and arising from his State court conviction. If he is denied relief in the federal district court then the law gives him the right to appeal." *Goode v. Wainwright,* 670 F.2d 941 (11th Cir. 1982). Because we conclude that at least one of Petitioner's claims presents a substantial question and because we cannot possibly give adequate review to his claims in the few days remaining before his scheduled execution, we must grant the stay in order to protect the Petitioner's right to appeal the district court's denial of habeas corpus relief.

One of the Petitioner's grounds for habeas relief is that the exclusion at his trial of three jurors who expressed reservations about capital punishment violated the Supreme Court's rule in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The Court's opinion in *Witherspoon* is based upon the recognition that a significant segment of the American population harbors serious reservations about the death penalty, and that the exclusion from jury service of persons who have such

reservations would result in a jury unconstitutionally composed because it is not representative of the community. Based upon this consideration and recognizing the State's legitimate interest in jurors who are not irrevocably committed to vote against the death penalty regardless of what the evidence may show, the Supreme Court held in *Witherspoon* that veniremen with reservations about capital punishment may be excluded from jury service *only* if they make unmistakably clear that:

> (1) they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*

*Witherspoon,* 391 U.S. at 522–23 n.21, 88 S.Ct. at 1777 (emphasis in original). A subsequent opinion of the Supreme Court in *Adams v. Texas,* 448 U.S. 38, 50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581 (1980), makes it clear that "neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty."

The voir dire examination of one of the jurors (L. R. Pfeffer) on the subject of his views about capital punishment consumes thirty-three pages in the record of the trial. During the initial two-thirds of that examination, venireman Pfeffer was, as the Court of Criminal Appeals recognized, equivocal in stating his position on capital punishment. He described himself as a "borderline thinker" on the issue of capital punishment, and expressed doubt that he could make the proper judgment because of his "mixed feelings" concerning the infliction of the death penalty. The following colloquy between the court and Pfeffer comes at the end of that portion of the examination and is representative of what precedes it:

THE COURT: Are you saying that under no circumstances could you ever make that decision or that it would just take an extreme set of circumstances before you would?

JUROR PFEFFER: It would take a very, very extreme set of circumstances to do it.

THE COURT: Then you're not opposed to it. Is that correct?

JUROR PFEFFER: Well, I'm not opposed to it, but in my own heart I don't know if I could make the decision, the proper decision with really by weighing the evidence, being on a thin line one way or the other. I mean, this is not directly—I know you would like direct answers, but this is the best I can do and it is a vague answer.

The turning point in Pfeffer's position, recognized as such by the Court of Criminal Appeals, immediately follows that testimony:

THE COURT: Well, the law requires that we have to have a definite answer.

JUROR PFEFFER: I understand, right.

THE COURT: Because the law does allow people to be excused because of certain beliefs that could be prejudicial or biased for one side or the other, and both sides just want to know if you can keep an open mind, consider the entire full range of punishment, whatever that may be, and under the proper set of circumstances, if they do exist and you feel they exist, that you could return that verdict. And that's in essence what they're asking.

JUROR PFEFFER: Indirectly, I guess I would have to say no.

THE COURT: You could not?

JUROR PFEFFER: I would have to say no then, to give you a yes or no answer.

THE COURT: Then, am I to believe by virtue of that answer that regardless of what the facts would reveal, regardless of how horrible the circumstances may be, that you would automatically vote against the imposition of the death penalty?

JUROR PFEFFER: As I say, I don't know.

THE COURT: Well, that's the question I have to have a yes or no to.

JUROR PFEFFER: Right.

THE COURT: And you're the only human being alive who knows, Mr. Pfeffer.

JUROR PFEFFER: Right, I understand. If I have to make a choice between yes and no, I would say that I couldn't make the judgment.

The remaining ten pages continue to reflect what Petitioner views as Pfeffer's apparent change of position from uncertainty to a refusal to consider the death penalty in order to provide the trial court with a "yes or no answer."

The Petitioner argues that the Supreme Court's opinions in *Witherspoon* and *Adams* preclude the exclusion of a juror who, after searching examination, remains uncertain on the subject of capital punishment and further preclude a judge from, in effect, forcing such a juror to take a firm position in the interest of providing a "yes or no answer." We think that a strong argument can be made that, contrary to the conclusion reached by the Court of Criminal Appeals, venireman Pfeffer's true position was that while he was uncertain about what he would do in any given case involving the death penalty, there were some circumstances (a "very, very extreme set of circumstances") under which he could assess the death penalty, and that his exclusion from jury service was, therefore, unconstitutional under *Witherspoon* and *Adams*. We think the Petitioner presents a substantial question and that Petitioner is entitled to pursue this point on appeal.

Petitioner raises on his application for stay two other arguments—one relating to the failure to include a charge to the jury on mitigation and one concerning the prosecutor's argument at the punishment phase of Petitioner's trial—which one member of this panel thinks present a substantial question and should be considered on appeal.

As federal judges, we are sworn to uphold the Constitution and laws of the United States, as they have been construed by the Supreme Court, and to apply those laws evenly with respect to all people. We believe that our sworn obligation is to grant a stay of Petitioner's execution.

STAY GRANTED.

GEE, Circuit Judge, dissenting:

I would not grant the stay; and since the panel majority has stated its reasons for doing so, I briefly state mine.

It is now almost eight years since Petitioner O'Bryan murdered his eight-year old son for insurance proceeds by feeding him Halloween candy laced with cyanide.[1] The evidence that he did so is clear; there is no doubt of his guilt. Even so, he was entitled to a fair and constitutional trial; and if I believed the record raised serious doubts about whether he received one, I would join in granting the stay. He makes three such claims.

One is that the charge by which jurors in Texas fix capital punishment is unconstitutional. He made no objection to the charge, however, and hence has waived the right to complain of it. *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). The charge has, moreover, already been upheld as constitutional by the United States Supreme Court. *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

Another claim is that the prosecutor, arguing in the punishment phase of his trial, erred in referring to O'Bryan's failure to produce testimony about his community reputation for truth and veracity, or as a peaceful and law-abiding citizen. These were matters in mitigation, matters for the defendant to advance if they were to be advanced by anyone. Though he produced witnesses to his civic and church activities, none were questioned on any of these subjects. Counsel for O'Bryan objected to the argument as "the State trying our case" and on the ground that "it's not our burden to bring any evidence into this courtroom ...."

---

1. Poisoned candy that he gave to his other child, also insured, and to three children of neighbors was retrieved after the death of Timothy, the murdered boy. Those and other facts of the case are related in the opinion of the Texas Court of Criminal Appeals and need not be repeated here. *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979).

It is settled, both in the law of Texas and of our circuit, that the prosecutor may comment on the defendant's failure to call certain witnesses. See *O'Bryan v. State,* 591 S.W.2d 464, 479 (Tex.Cr.App.1979); *United States v. Lehmann,* 613 F.2d 130 (5th Cir. 1980). But even if, as I do not think, the argument was an erroneous one, it clearly amounted to no more than ordinary trial error and not "that sort of egregious misconduct held in Miller[2] and Brady[3] ... to amount to a denial of constitutional due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 647–8, 94 S.Ct. 1868, 1873–1874, 40 L.Ed.2d 431 (1974).

Finally, petitioner claims that three veniremen were improperly excused from jury service in contravention of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Two of the veniremen, however, Messrs. Bowman and Wells, early and candidly acknowledged that they would automatically vote against the death penalty in all circumstances, a clear disqualification under *Witherspoon.* The third, Mr. Pfeffer, engaged in a lengthy sparring session with counsel and with the court on the subject, giving equivocal and conditional answers over almost fifteen pages of record testimony. When at last pinned down by the court, however, and required to give a clear answer one way or the other, he responded:

> THE COURT: You yourself are in such a frame of mind that regardless of how horrible the facts and circumstances are, that you would automatically vote against the imposition of the death penalty? Is that correct?

**2.** *Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) (prosecutor, who knew undershorts were stained with paint only, repeatedly described them during trial as bloodstained).

**3.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (prosecutor deliberately withheld evidence bearing on extent of petitioner's involvement in the crime).

**4.** O'Bryan asserts a supposed right of veniremen to persist in equivocal answers to such questions, citing *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). I find no such holding in *Adams.* It held that veniremen

> JUROR PFEFFER: Well, if it says a yes or no, I would have to say yes, I would automatically vote against, to give a correct answer.
>
> THE COURT: You would vote against?
>
> JUROR PFEFFER: Yes.
>
> THE COURT: Any other questions?

Later, in response to renewed questioning by defense counsel, he three times reaffirmed the answer set out above. In my view, his earlier equivocal responses are robbed of further significance by these latter answers which, the record makes plain, were in no sense coerced as to their tenor by the judge—who simply, and at last, required him to answer the question clearly, yes or no.[4] Indeed, and with all deference, I do not see how there can be a different view of the matter.

For the reasons that I have stated, then, I would not further delay this eight-year old matter in response to an eleventh-hour plea advancing grounds that seem to me clearly devoid of merit. We are, as my brethren's opinion observes, sworn to uphold the law and the Constitution. I find no warrant in either for a stay. And while I thoroughly respect my brethren's convictions and take no pleasure whatever in standing alone in my own—convictions that would dictate the execution of a fellow human being—I fear that the granting of a stay on such grounds as these trivializes state criminal procedures and goes far to forward a public perception that the real rule of our courts regarding capital sentences is that, while they may be imposed, they cannot be carried out. I would not grant the stay.

could not be excluded merely because they stated that their deliberations would be "affected" by the possibility of the death penalty, or even because they were unable to state whether or not their deliberations would in any way be "affected." 448 U.S. at 50, 100 S.Ct. at 2529. That holding has no bearing on the issue before us, which is whether the judge properly excluded Mr. Pfeffer after requiring him to give a clear answer whether "he would automatically vote against the imposition of the death penalty." He answered that he would and he was properly excluded.