**Randy Dale MAYO, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69462.**

Court of Criminal Appeals of Texas, En Banc.

April 30, 1986.

Kirk Hawkins, Stephen R. Lupton, San Angelo, for appellant.

Gerald A. Fohn, Dist. Atty. and Tom McCoppin, Asst. Dist. Atty., San Angelo, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

This is an appeal from a conviction for the capital murder of Kimberly Sue Reeves. Appellant pled not guilty. The jury found appellant guilty of capital murder while in the course of committing aggravated sexual assault. See V.T.C.A., Penal Code Sec. 19.03(a)(2). After the jury returned an affirmative answer to the first two special issues[1] in Art. 37.071, V.A.C.C.P., the trial court imposed the sentence of death by lethal injection. This case is before us on direct appeal.

On April 13, 1984, between the hours of 1:30 and 2:30 p.m., the body of the deceased was found next to the concrete supports of a bridge crossing over part of Lake Nasworthy in Tom Green County. Police found Ms. Reeves' automobile and personal belongings approximately 600 yards from the bridge supports. She appeared to have been sunbathing. She was last seen alive at approximately 10:30 a.m. on April 13 by students at Angelo State University in San Angelo. The body of the deceased, identified by her father, was transported to San Antonio for an autopsy. The autopsy revealed that Kimberly Sue Reeves died as a result of a blow to the skull and brain with a blunt instrument. It was further concluded by the medical examiner that neither of two stab wounds, one to the neck and one to the abdomen,

---

1. Article 37.071, V.A.C.C.P., reads in pertinent part:

"...

"(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result:

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased."

The third special issue in Art. 37.071, supra, was not submitted, and it is not contended on appeal that it should have been, because it was not raised by the evidence.

would have caused death under ordinary circumstances. Examination of the vaginal cavity of the deceased indicated the presence of spermotazoa.

Appellant was seen driving later that same evening in San Angelo. He pulled his car into the Sonic Drive In and was arrested at approximately 8:45 p.m., pursuant to a warrant from Lubbock County for another crime.

Appellant made two confessions to police, the validity of which are not before us for review. He also led police to an area where he had thrown the jack stand he used to crush the skull of the deceased. Appellant does not question the sufficiency of the evidence to support his conviction.

■ In his first ground of error, appellant alleges the trial court erred by overruling his motion for new trial. Appellant's motion for new trial alleged a violation of Art. 40.03(7), V.A.C.C.P.[2] Specifically, after presentation of the evidence in the punishment phase, but before final arguments and deliberations, Dennis Potter, the foreman of the jury, made a telephone call to Raymond Allison, a witness who testified on behalf of the defense in the punishment phase. Appellant claims *McMahon v. State,* 582 S.W.2d 786 (Tex.Cr.App.1978), *cert. den. sub. nom., McCormick v. Texas,* 444 U.S. 919, 100 S.Ct. 238, 62 L.Ed.2d 175 (1979), *reh. den.* 444 U.S. 985, 100 S.Ct. 492, 62 L.Ed.2d 414 (1979), and *Williams v. State,* 463 S.W.2d 436 (Tex.Cr.App.1971), hold that injury to the accused is presumed when a juror converses with an unauthorized person. However, the State points out, and appellant concedes, this presumption is rebuttable, *McMahon,* supra.

The trial court held a hearing on appellant's motion for new trial. At the hearing, Allison testified that he was contacted by Dennis Potter on January 30, 1985, at about 5:00 p.m., after the jury had been released for the day. Allison stated that Potter told him he appreciated his [Allison's] testimony because he seemed to be the only witness who said anything good about appellant. Allison asked Potter to be lenient toward appellant because he [Allison] felt that if given a chance, possibly to learn a trade while in prison, appellant could be a benefit to society when he got out. Potter, who also testified at the hearing, corroborated this testimony. Both men stated that everything stated in the phone call had been said at trial. Another juror, John Michael Anderson, testified at this hearing that Potter made no mention, to any member of the jury, of the phone call to Allison during any of the jury's deliberations. Additionally, according to Anderson, no one in the jury room brought up how much time appellant might actually have to spend in prison if he received a life sentence.

Appellant's attorney conceded that Allison's testimony at trial was along the same lines as the testimony brought out at the motion for new trial hearing, but claims that the State has not rebutted the presumption of harm.

We disagree. The testimony at the motion for new trial hearing indicates that the conversation on the telephone was substantially the same in content as Allison's testimony at the punishment phase of appellant's trial. The only statement made in the telephone call that was not said at trial was that Allison expressed his wish to Potter that appellant be given a more lenient sentence than the death penalty. Judging from the sentence received, death by lethal injection, it appears Allison's plea for a life sentence was totally disregarded. We find the State has rebutted the presumption of harm under *McMahon,* supra.

Ground of error one is overruled.

---

**2.** Article 40.03, V.A.C.C.P., reads in pertinent part:

"Art. 40.03. Grounds for New Trial in Felony

"New trials, in cases of felony, shall be granted the defendant for the following causes, and for no other:

" . . .

"(7) Where the jury, after having retired to deliberate upon a case, has received other evidence; or where a juror has conversed with any person in regard to the case; . . ."

Appellant's second ground of error is a failure to grant a mistrial because evidence of an extraneous offense was admitted during the guilt/innocence phase of appellant's trial. Jimmy Don Daniel, a witness for the State, testified before the jury that appellant called him on the telephone and told him he had been arrested on a capital murder charge. Appellant contends that Daniel was undoubtedly making reference to an unrelated, extraneous capital murder, because at the time of the phone call appellant had not yet been charged with the capital murder in the present case. The transcription of the relevant testimony reads as follows:

*By Mr. McCoppin* [prosecuting attorney]:

"Q. Directing your attention to the evening hours of April the 13th, 1984, did you have occasion to have telephone contact with Randy Dale Mayo?

"A. Yes, sir.

"Q. Approximately what time was that?

"A. I'm not sure. I didn't pay any attention to the clock because I was already asleep.

"Q. Okay. Do you have any idea?

"A. Well, I know I went to bed about—I imagine, around 9:30 or 10:00, somewhere around there, I guess, something like that.

"Q. Okay. What, if anything, did he say when he called you on the phone?

"A. He told me that he'd been arrested on a Capital Murder charge and would I please—

"Q. Uhhh ... Without—

"MR. HAWKINS [defense attorney]: Your Honor, I'd object to that question and answer. Calls for hearsay, first of all.

"And I'd ask the Jury to disregard the witness' answer.

"THE COURT: All right, what do you say? Do you have any—

"MR. McCOPPIN: No objection, Your Honor.

"THE COURT: I'll sustain the objection. The Jury will not consider the answer.

"MR. LUPTON [defense attorney]: Your Honor, due to the prejudicial nature of the statement, I'd move for a mistrial.

"THE COURT: I can't hear you. You're going to have to speak up, now.

"MR. LUPTON: Due to the prejudicial nature of the statement, I'd move for a mistrial, Your Honor.

"THE COURT: Overruled.

"MR. McCOPPIN: We withdraw that question, Your Honor. Pass the witness.

"MR. LUPTON: No questions, Your Honor."

The record reflects that appellant was actually arrested pursuant to a warrant concerning another, unrelated capital murder. However, the testimony complained of gives no indication that appellant was or was not actually speaking of the case at bar. We cannot find anywhere in the statement of facts where it is stated *before the jury* that appellant was arrested for anything other than the present case. We note that at the time appellant made the aforementioned telephone call, the investigation had begun to focus on appellant concerning the capital murder in the present case. We do not believe, based on these facts, that the jury could have been misled, or that appellant could have been harmed by the aforementioned testimony.

Appellant's second ground of error is overruled.

Appellant, in his third ground of error, claims the evidence was insufficient to warrant an affirmative finding by the jury to the second special issue in Art. 37.071, supra. In support of his contention, appellant points out that the State presented only *one* prior final conviction, that of burglary. The State introduced evidence of an unrelated murder, wherein appellant beat a man to death. The State also introduced numerous instances wherein appellant threatened death or serious bodily injury to various individuals. Appellant *appears* to claim these extraneous offenses, which are unadjudicated, are not probative of the sec-

ond special issue in capital murder cases. See Art. 37.071(b)(2), supra.

 We find appellant's ground of error to be without merit. In the punishment phase of a capital murder case, *any* evidence that the trial court deems relevant to sentencing may be presented. Art. 37.-071(a), supra. Unadjudicated extraneous offenses have been held to be admissible at the punishment phase of the trial. *Rumbaugh v. State*, 629 S.W.2d 747 (Tex.Cr.App.1982); *Williams v. State*, 622 S.W.2d 116 (Tex.Cr.App.1981), *cert. den.* 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). Further, the circumstances surrounding the capital offense itself, if severe enough, can be sufficient to sustain an affirmative finding under the special issues in death penalty punishment determinations. *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Cr.App.1979).

 In the present case, appellant forced Kimberly Sue Reeves, who was sunbathing, to submit to his sexual desires at knifepoint. After raping her, he stabbed her twice, neither of the two wounds resulting in injury severe enough to cause her death. Then, as he was leaving the scene, he went to his car and removed the jack stand, came back to where Ms. Reeves was laying face down, and proceeded to literally beat her brains out with the steel jack stand.

We find this type of conduct, and the other evidence brought out at the punishment phase, sufficient to sustain the affirmative finding of the jury to the second special issue.

The judgment of the trial court is affirmed.

CLINTON, J., concurs in the result.

TEAGUE, Judge, dissenting.

The record clearly reflects that before jury arguments were heard at the punishment stage of the trial and, of course, before the jury had retired to deliberate on the special issues that they were going to have to answer, see Art. 37.071, V.A.C.C.P., Dennis Potter, the foreman of the jury that sat in this cause, without authority, telephoned and had a conversation about the case with Raymond L. Allison, a defense witness who had testified at the punishment stage of the trial of Randy Dale Mayo hereinafter referred to as the appellant.

The conversation that Potter had with Allison was clearly a violation of Art. 36.22, V.A.C.C.P., which provides: "No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court."

This Court has long strictly construed and applied this statute. In *Chappell v. State*, 121 Tex.Cr.R. 293, 50 S.W.2d 327, 328 (1932) (On motion for rehearing), this Court, quoting from *Mauney v. State*, 85 Tex.Cr.R. 184, 192, 210 S.W. 959, 962 (1919), stated the following:

"Not only should the appearance of evil be avoided by strict observance of this statutory rule forbidding communications with the jury (or a juror with an outsider) when the court is not present, but the further fact is true that human nature is frail and prone to excuse itself; and it is easily possible to conceive a case where the party conversing with a juror, as well as the juror himself, fearful of punishment for contempt, might not remember all that passed at such conversation (or what affect the conversation might have had on the juror), and might deny mention of the case between them by virtue of a convenient memory. We think the rule in cases of a violation of the provisions of article 728 ought to be that injury in such case is presumed unless the contrary is made to appear to the satisfaction of the court, and ultimately this court. Any presumption can be overcome by evidence, and in such case of presumptive injury the burden ought to be on the state to satisfy the court that *no injury* has resulted from such violation of the statute." (My emphasis.)

In *Pearson v. State*, 145 Tex.Cr.R. 87, 165 S.W.2d 725 (1942), (On appellant's motion for rehearing), this Court also stated the following:

Touching the question of conversing with the jury, or a conversation indulged in by a juror ... it is now the settled rule that, where it is made to appear that a conversation has occurred between a member of the jury and some person other than as authorized under the provisions of [the] statute, the State must show that the accused was not injured or prejudiced thereby. *Such showing, however, is not accomplished by the testimony of the juror alone. There must be testimony other than that of the juror showing that the accused was not injured or prejudiced by the conversation so had.* The authorities supporting the rule are cited in the prior opinions herein. (My emphasis.)

Also see *Romo v. State,* 631 S.W.2d 504 (Tex.Cr.App.1982). Cf. *Chambliss v. State,* 647 S.W.2d 257 (Tex.Cr.App.1983).

Thus, if the defendant establishes a violation of the statute, the existence of harm is assumed as a fact, and the assumed fact, in this instance harm, operates as a legal presumption, and, in the absence of evidence to the contrary, the presumption remains in effect and controls. See 23 *Tex. Jur.*2d Evidence Section 76 (1961). To overcome the presumption of harm that arises because a juror has an unauthorized communication with an outsider, the State has the burden to prove, if it can, that the evidence establishes *the non-existence of harm.* Ray, 1 *Texas Practice, Law of Evidence,* Section 53. Thus, as applied to this cause, the above rules of law required the State to establish at the hearing on the appellant's motion for new trial, *without the testimony of Potter,* that there was not a reasonable possibility that his conversation with Allison affected his decision on punishment. E.g. *Chapman v. California,* 386 U.S. 18, 21–24, 87 S.Ct. 824, 826–828, 17 L.Ed.2d 705 (1967); *Clemons v. State,* 605 S.W.2d 567, 571 (Tex.Cr.App.1980).

The majority opinion states: "The testimony at the motion for new trial hearing indicates that the conversation on the telephone was substantially the same in content as Allison's testimony at the punishment phase of appellant's trial."

However, in making this statement, the majority opinion overlooks that part of the unauthorized conversation in which Allison related new facts to Potter about the appellant's natural mother which had not been brought out at the punishment hearing, particularly, the part where Allison told Potter that the appellant's natural mother "appeared to be full of demons."

The transcription of the hearing on the appellant's motion for new trial reflects that Allison testified that after Potter telephoned him, he then commenced "talking (to Potter) about the Bible and told (Potter) that God had given chances to people in the Bible—Paul, for instance—and I talked quite a bit about the Bible. And then— Then we talked about his—Right before we ended, we talked about the boy's mother and how old she looked and it looked like she had ... demons in her and looked like she was over sixty years old." Allison later changed the appellant's mother's age to sixty-five years. Allison further testified: "And then we talked about him (Potter) being the Jury, and he said that he would—he'd already had his mind (made) up (on the punishment issues even though the jury had not then deliberated to decide the punishment issues, see Art. 37.071, supra,) but, he said, hearing my testimony about Randy and my son's testimony, that this changed a different outlook on him toward the trial. And then I thanked him—for calling."

On cross-examination, Allison testified that the last words he uttered to Potter were: "Praise the Lord," which was in response to Potter's apparently last statement that "he was going to reconsider his position."

In deciding whether the evidence is sufficient to sustain the jury's affirmative answer to special issue number 2, the probability question, see Art. 37.071, supra, this Court has held that damaging testimony going to the accused's personal background, i.e., that the accused had a terrible family environment when growing up, is evidence that can be used to support the jury's affirmative finding. See *Brock v.*

*State,* 556 S.W.2d 309, 317 (Tex.Cr.App. 1977).

Obviously, no one can guess what effect the unauthorized injection of the new facts into the case had on Potter, and that is the reason why I find this Court has placed a presumption of harm on any unauthorized conversations with or by jurors in a case-to eliminate guesswork as to what effect such a conversation might have had.

All of Potter's testimony demonstrates to me that he is a very religious person. Because of this, I am confident that he is familiar with stories about women who were filled with "Daemons" because they had had familiarity with the Devil, to the extent of frequently permitting the Devil having carnal knowledge of their bodies. See, for example, Increase Mather, *Remarkable Providences Illustrative of the Earlier Days of the American Colonialism,* G. Offor, ed., London, 1856, 1890.

It is also possible that Potter reads literally the following passage from the Bible: "The Lord is long-suffering, and of great mercy, forgiving iniquity and transgression, and by no means cleansing the guilty, visiting the iniquity of the father's [or mother's] upon the children unto the third and fourth generation." Numbers 14:18 (King James).

Given Allison's testimony that he and Potter "talked quite a bit about the Bible," and taking into consideration the various interpretations to which the Bible has been subjected, it is quite possible that their discussion convinced Potter that the right thing to do, in order to prevent the demons that might have inhabited the appellant's body from being transmitted any further, was to answer the special issues in the affirmative, thereby ensuring the appellant's death and perhaps eternal demise of the demons. I cannot say that this actually happened; however, without Potter's testimony, the majority opinion cannot state that it did not happen. Perhaps, however, after his conversation with Allison, Potter became convinced that making sure that the appellant received the sentence of death was the only reliable means of exorcizing any demons that appellant might then have had in his body. I cannot state that this actually happened; however, without Potter's testimony, the majority also cannot state that it did not happen. Perhaps, however, after his conversation with Allison, Potter then believed that the demons were only inhabiting the body of appellant's natural mother, and had not yet passed on to the appellant, and, based upon this belief, he believed that by making sure that the appellant received the death sentence this would ensure that the appellant would not suffer from the fate of demon possession suffered by his natural mother, and would thus allow the appellant's entrance into eternal glory. I cannot state that this actually happened; however, without Potter's testimony, the majority opinion also cannot state that it did not happen.

What I have tried to make obvious by the above is that if conjecture over what effect the new information about the appellant's natural mother might have had on Potter is inappropriate, which it is, that is the point, and because no one can guess what effect the unauthorized injection of new facts about the case might have had on Potter that is why there is a presumption of harm. In this case, without Potter's testimony, we are left with conjecture, which causes an irrebutable presumption of harm to exist.

The majority opinion, by summarily and erroneously concluding that no new or different facts had been related during the conversation that Potter had with Allison, completely nullifies both the spirit and the letter of the well-settled law on this issue.

Because I do not believe that the State rebutted the presumption of harm that came into existence as a result of the unauthorized telephone conversation that Potter had with Allison, I am compelled to dissent to the majority opinion's contrary holding. In short, I cannot state that there is not a reasonable possibility that the unauthorized conversation that Potter had with Allison affected Potter's decision to answer the special issues in the affirmative, thus assuring that the appellant received the sentence of death. Believing that the State

failed to rebut the presumption of harm, injury, or prejudice to the appellant, I would sustain the appellant's first ground of error and grant him a new trial. To the majority opinion's failure to do this, I respectfully dissent.