Robert MIZE, Appellant,

v.

The STATE of Texas, Appellee.

No. 13–87–089–CR.

Court of Appeals of Texas,
Corpus Christi.

May 26, 1988.

Rehearing Denied June 23, 1988.

John Miller, Jr., William G. Bernett, Sinton, for appellant.

Thomas L. Bridges, Dist. Atty., Sinton, for State.

Before DORSEY, UTTER and BENAVIDES, JJ.

## OPINION

DORSEY, Justice.

A jury found appellant guilty of murdering his wife, Lynna, and assessed punishment at 75 years in the Texas Department of Corrections. We affirm.

■ Appellant, in his first two points of error, contends that the evidence is insufficient to sustain the conviction, which is based on circumstantial evidence. The State's interpretation of the evidence was that appellant suffocated his wife, Lynna, while she slept in their bedroom and set fire to their house to conceal the crime. The motive for the killing in the State's view was an extra-marital affair between the appellant and a neighbor.

Because the evidence was at times conflicting and the conclusions drawn were hotly contested, it is necessary to set out the evidence in some detail.

Frank Gaydos, appellant's neighbor, testified that around 5:00 a.m. on May 19, 1986, after being awakened by the sound of breaking glass, he went to his front door and found J.W. and Spencer Mize, ages seven and nine, who told him their house was afire. Mr. Gaydos found appellant, Robert Mize, coming through a window of the burning house. Appellant told him that Lynna Mize was still in the house. Mr. Gaydos entered the house through the same window that appellant had exited, but was unable to see anything because of the smoke. He and appellant went to another window in the bedroom of Lynna and Robert Mize. They broke that window, and appellant went in first and came back out stumbling. Mr. Gaydos then went in through the window, found lots of heat and some flame, and saw Lynna Mize lying on her bed. He touched her and her body was hot. Mr. Gaydos was able to pull Lynna Mize from the house through the window. Mr. Gaydos testified that Lynna's body was hot and stiff.

Various rescue personnel who responded to the fire testified that Lynna's body was rigid. Mouth-to-mouth resuscitation was attempted by several of the early arrivals, but to no avail. One paramedic testified that there was a pooling of blood on the back of her neck and upper shoulders, an indication that she had been dead for a period of time.

The medical examiner of Nueces County, Dr. Joseph Rupp, testified that Lynna Mize died prior to the fire and not as a result of it. The evidence that gave rise to his conclusion was that no soot was found in the mucus of the nostrils, the bronchial tree, nor the lungs. Dr. Rupp testified that in his opinion death was caused by asphyxiation: a lack of oxygen. Dr. Rupp's conclusion that the cause of death was asphyxiation was based primarily on the existence of petechial hemorrhages in the eyes caused by lack of oxygen. He found that there were fresh lacerations on the lower lip and a fresh laceration of the frenulum, a small membrane inside the mouth between the upper lip and the gums. There were no bruises on the hands, palms, or knuckles that would indicate she was held or that there was a struggle. There were no defense wounds, and her medium length fingernails were intact. Dr. Rupp concluded that the death was not natural and was intentionally caused. He opined that the laceration of the frenulum was consistent with death by smothering. The victim had food in her stomach when she died. The stomach would have emptied in approximately four hours after eating.

A fire inspector, Manuel Vasquez, who is a Deputy State Fire Marshal, testified that he had determined from examination of the scene that an undetermined combustible material was ignited in two locations in the Mize bedroom: under the bed upon which the body was located, and on the floor in the entranceway of the bedroom from the hall. From the evidence available, he concluded that the fire smoldered because of the lack of oxygen until the windows were broken to give it a fresh source of air. It had been smoldering about an hour before the windows were broken, at a little after 5:00 a.m. The two independent fires were not caused by one another, and he concluded that someone had intentionally set both.

Other evidence was admitted during the State's case in chief that the appellant owned a security and fire alarm company, and he installed various alarms in businesses in the area, as well as maintained them after installation. Fire alarms were in place in the house. An employee of appellant, Leroy Grumbles, testified that appellant told him prior to the fire that he was having an affair with a lady who lived across the street. Mr. Grumbles further testified that appellant told him that he and his wife were having certain marital problems and that Lynna Mize could leave at any time as long as she didn't take the children with her. Grumbles further testified that the appellant told him he knew how to cover a crime with a fire so the crime could not be detected.

Fire Chief Martinez of the Aransas Pass Fire Department testified that when he arrived at the fire scene other firemen and police officers had already arrived. The doors to the Mize house were locked, and water was being squirted in the windows of the house. After the fire was extinguished, he got keys to the house from Leroy Grumbles and later accompanied the representative of the State Fire Marshall through the scene.

The appellant, Robert Mize, testified that he had gone on several business calls on the evening before the early morning fire and returned home sometime between 9:30 and 11:00. He and his wife visited a while before she decided to go to bed. He stayed up and watched a movie on television. He testified he was awakened in the early morning by the sound of a fire alarm in the house. He went into the east side of the house, where all three bedrooms were located, and found smoke in the first bedroom where the children slept. The children were awake and crying. The defendant broke a bedroom window and got the children out of the house through that window. He testified he was unable to get back to his bedroom to rescue his wife because of the smoke in the hall.

The defense called a fire investigator as an expert who testified that the fire originated in a closet and he found no evidence of incendiary causation. A large number of witnesses testified as to the good relations between the defendant and his wife and their involvement in community affairs.

Dr. Vincent Dimaio, Chief Medical Examiner for Bexar County, testified that from the autopsy report the conclusions of an asphyxial death were justified and that the victim did not die in the fire. He faulted the failure of the autopsy to eliminate other possible causes of death because of the lack of sophistication of the tests conducted. He suggested that the size of the victim and the absence of evidence of a struggle argue against death by suffocation.[1]

As is the case in every conviction based on circumstantial evidence, certain hypotheses other than the guilt of the defendant can be presented to explain the commission of the crime. In applying the correct standard of review, however, the duty of an appellate court is not to reweigh the facts or decide guilt, but to determine whether a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt.

1. Dr. Dimaio's testimony is discussed in greater detail under points three through six of this opinion.

There is no evidence to support that anyone other than appellant, Lynna, and the children were present in the Mize house on the night of the fire. The house was locked and there was no evidence of forced entry prior to the discovery of the fire. The evidence shows Lynna was dead before the fire began and, considering the rigidity of the body and presence of food in the stomach, had died of asphyxiation a considerable time before the fire was discovered. There is evidence to suggest that Lynna was not in her normal sleeping position (as the bed lacked a covering sheet and blanket) and was, in fact, positioned in a laid out manner on the bed. The fire was intentionally set in two locations in the bedroom; it was a smoky fire that smoldered an hour or so before discovery; and typical smoke detectors would have sounded shortly after such a fire began. There was evidence that the victim was "smothered" as alleged in the indictment.

Given the circumstances of death, the nature of the fire, and the other surrounding circumstances, the evidence is sufficient to sustain the conviction. Appellant's first and second points of error are overruled.

### SUPPRESSION POINTS

■ In appellant's third, fourth, fifth, and sixth points of error, he complains the trial court erred in failing to grant his motion for new trial because certain photographic slides taken during the autopsy were not made available to him in violation of a discovery order. The trial court, prior to trial, ordered the State to produce, to allow the defense to inspect and copy, all photographs taken during the autopsy of the deceased. The district attorney gave the appellant all the photographs in his possession for inspection. However, seven photographic slides that were taken by Dr. Joseph Rupp, the Nueces County Medical Examiner, were not disclosed to the appellant nor to the district attorney until after the State's rebuttal case began.

During the State's case-in-chief, Dr. Rupp testified that the deceased died before the fire of asphyxiation that was caused by suffocation. The evidence of asphyxiation, a deprivation of a supply of oxygen, relied on by Dr. Rupp were petechial hemorrhages in the eyes. He also found a contusion and laceration of the frenulum that appeared fresh and a small abrasion or contusion of the upper lip. These facts, along with the conclusion that she did not die in the fire, were the foundation of his finding that the death was not natural and was intentionally caused by smothering. He testified that the determination whether the frenulum was torn when she was alive or dead is a difficult one, and the presence or absence of blood around the laceration of the frenulum does not have much meaning, although he did not see any blood in association with the lacerated frenulum.

The defense presented Dr. Vincent Dimaio, Chief Medical Examiner of Bexar County, who had examined the autopsy report, photographs of the deceased, reports from the State Fire Marshall and law enforcement agencies, and witnesses statements. He agreed that the victim did not die in the fire because of the absence of soot in the mouth, nostrils, or airway, and there was no elevated carbon monoxide level in the blood. He said that three things in the autopsy report need to be considered to determine if the cause of death was asphyxiation: petechia of the eyes, abrasion on the lip, and the torn frenulum. The torn frenulum and abrasions could have resulted from the attempted resuscitation of the deceased, given the "cooked" condition of the body. Therefore, only the petechia, the small hemmorhages, suggest asphyxia. However, they are caused by a number of events, such as heart failure. He found no indication that the death was caused by homicidal assault, and suggested other possible causes that were not revealed by the autopsy conducted by Dr. Rupp, because the tests utilized by Dr. Rupp lacked the sophistication necessary to eliminate other possible causes of death. Dr. Dimaio testified at some length discounting the probability that the deceased was suffocated by an object, such as a pillow, being held over her mouth, given the size of the victim, the absence of de-

fense wounds, and that the fingernails were intact. In order to kill someone by smothering with a pillow, according to Dr. Dimaio, the air supply would have to be interrupted for over a minute, and one would expect to see evidence that the victim struggled, clawed, or fought during the ordeal. He has never seen a case of smothering an adult to death, although he has seen such deaths in children. In those deaths there were no petechiae of the eyes.

On rebuttal Dr. Rupp testified that he ordered tests on specimens of tissue and blood from the deceased after the testimony of Dr. Dimaio. As a result of those tests, Dr. Rupp rejected the alternative causes of death suggested by Dr. Dimaio.

At the hearing on the motion for new trial, trial counsel for appellant testified that on the morning of Dr. Rupp's rebuttal, prior to the testimony, he observed Dr. Rupp in the district attorney's office with a slide projector and screen. Upon inquiry he was told that Dr. Rupp had found seven slides taken during the autopsy showing a closer view of the petechea of the eye, the torn frenulum, and other close-ups of the deceased. After counsel protested their use when they had not been previously disclosed to him, the State's attorney did not offer the slides during the trial.

At the hearing, defense counsel testified that Dr. Dimaio had already left town and returned to San Antonio when he discovered the existence of the slides, as the doctor had been released from his subpoena. Dr. Dimaio's affidavit was introduced stating that he had seen no close-up view of the victim's mouth, lips, and frenulum; that such slides would be material in arriving at an opinion on the cause of death; that if the slides showed no contusions or bleeding from the mouth, lips, or frenulum, they would tend to refute that the victim died from asphyxiation as a result of something forcefully held over her face and mouth.

Dr. Rupp testified at the hearing that the matter shown by the slides were described in his report, and that it would not have been necessary for a pathologist to view the slides in order to arrive at an opinion on the cause of death in this case. He also testified that pressure on the frenulum would have kept it from bleeding.

Dr. Charles Simpson, a medical doctor, testified that the slide showing the torn frenulum showed an absence of blood, which indicates the tear was inflicted after death, and could have been caused by mouth-to-mouth resuscitation. He also testified that the hemorrhages around the eyes could have been caused by hard coughing or vomiting.

The slides themselves were described with the focus being on one showing the inside of the mouth and the torn frenulum; no blood was apparently visible from the slide. The other slides showed small hemorrhages around the eyes and lids.

The seminal case on the failure of the State to disclose information in the face of an order or request is *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) in which the court wrote: "We now hold that the suppression of evidence favorable to an accused upon request violates due process irrespective of the good faith or bad faith of the prosecution." The failure of the prosecutor to produce the evidence when a specific request has been made is reversible error if the evidence might have had an effect on the outcome of the trial. *Butler v. State*, 736 S.W.2d 668, 670 (Tex.Crim.App.1987).

Our inquiry here is whether the withheld slides would have had an effect on the outcome of the trial had they been made available to the defense. We note that no motion for continuance was made when appellant first learned of the existence and content of the slides, as appears to be required by *Wallace v. State*, 458 S.W.2d 67, (Tex.Crim.App.1970) citing *Juarez v. State*, 439 S.W.2d 346 (Tex.Crim.App.1969). From both the evidence adduced at trial and at the motion for new trial, we do not find that the slides are exculpatory. The torn frenulum and the absence of blood around the laceration was never disputed at trial, and the slides do not disclose anything contrary to Dr. Rupp's description of the injury. There was no evidence at the motion for new trial that would indicate the slides of the petechial hemorrhages re-

vealed something different than Dr. Rupp's description, nor that an expert viewing the slides would have come to a conclusion different than Dr. Rupp's.

Although we are sensitive to the importance of expert witnesses examining the best evidence in order to reach a conclusion, we cannot say that the slides might have had an effect on the outcome of the trial. Accordingly, appellant's third, fourth, fifth, and sixth points of error are overruled.

### PROSECUTORIAL MISCONDUCT AND JUROR CONTACT POINTS

Appellant alleges in his seventh point of error that after the verdict of guilty, but before punishment deliberations, an unknown third party communicated with juror Sue Manual about the case. In points eight, nine, and ten, appellant asserts that the district attorney's non-disclosure of these communications deprived appellant of a fair trial, due process of law and the effective assistance of counsel as guaranteed by the due process clause in the Fourteenth Amendment of the United States Constitution and Article I, § 19 of the Texas Constitution.

At the hearing on appellant's motion for new trial, Juror Manual testified that she received two phone calls concerning the case. She received the first telephone call at home on Friday, shortly after the jury had returned its guilty verdict. The caller said, "This is a concerned citizen for Robert Mize and you're a bitch."

Manual received a second call on the following Tuesday morning, which was the "morning [she was] supposed to come back into court for sentencing." This time the caller said, "You're going to be sorry." This second call was received by Manual "at home, before [she] left to come to work."

Manual informed her boss, Chief Deputy Larry Moody of the San Patricio County Sheriff's Department, about the calls later that same morning. While she did not specify the exact time at which she informed Moody, her testimony strongly suggests that she did so before 9:30 a.m., the commencement time of the punishment phase of trial. Manual testified that she informed none of the other jurors about the phone calls and that they had no effect on her deliberations.

Leroy Moody testified that he told the district attorney about the phone calls approximately "fifteen or twenty" minutes after he was informed of them by Manual.

Other evidence at the hearing on motion for new trial revealed that: (1) before trial, appellant elected in writing to have the jury rather than the judge assess punishment; (2) after guilt was found defense counsel spoke with the district attorney about changing the punishment election on Monday morning, and later that day the district attorney expressed his willingness to consent to such a change;[2] (3) appellant's trial attorney testified that knowledge of the telephone calls to the juror would have significantly affected his advice to appellant concerning whether to have the judge or jury assess punishment; (4) no change in election was made and the jury assessed punishment; (5) the district attorney failed to inform counsel or the judge of the calls before the jury retired to deliberate on punishment; and (6) defense counsel did not learn of the calls until his wife informed him while the jury was deliberating.

The trial court's docket sheet shows that appellant rested the punishment phase of his case at 12:06 p.m. The jury retired to deliberate punishment at 2:09.

Appellant's trial attorney testified at the new trial hearing that around 4:00 p.m. that day, he telephoned his wife to report that the jury was still deliberating and that he would be late for dinner. Counsel's wife asked what had "happened about the phone call." She then told him that one of the jurors had received a phone call. Counsel had been unaware of the calls before

**2.** If a finding of guilty is returned, a defendant may, with the consent of the attorney for the State, change his election of one who assesses the punishment. Tex.Code Crim.Proc.Ann. art. 37.07, § 2(b).

this time. Counsel went to the trial judge who also knew nothing about the telephone calls. At this point, about 4:15 p.m., counsel went to the prosecutor and was told that juror Manual had received some phone calls.

At 4:35 p.m., the jury returned a verdict on punishment. Before the jury announced its verdict, appellant made no effort on the record to bring the matter to the trial court's attention. The verdict was accepted without objection by appellant.

Appellant timely filed a motion for new trial. With leave of court, an amended motion for new trial was filed on April 1. In both motions, appellant alleged four grounds for granting a new trial. His sole assertion with respect to the jury communication was: "After retiring to deliberate, an unknown person conversed with the juror, Sue Manual, in regard to the case."

At the new trial hearing, appellant argued that the undisclosed juror communication had "materiality in two areas." The first, he argued, concerned the potential effect of the communication on the juror. The second concerned the effect of the communication on appellant's election to have the jury or judge determine punishment. The trial court denied the motion for new trial without any summation, discussion, or comment on the evidence. *See* Tex.R.App.P. 31(e)(2). The trial court's denial of the motion after hearing must be taken as deciding that no jury misconduct occurred to deprive appellant of a fair and impartial trial. *See De La Rosa v. Texas*, 743 F.2d 299, 305 (5th Cir.1984).

The complaints concerning due process of law as guaranteed by the Fourteenth Amendment of the U.S. Constitution appear to be controlled substantially by *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). In *Smith*, a case rising from a conviction in state court, during trial one of the jurors submitted to the district attorney's office an application for employment. The prosecuting attorneys became aware of the application during trial and before deliberations began, but concluded that there was no need to inform the trial court or defense counsel of the

application. When defense counsel learned of the incident after trial, they moved that the verdict be vacated, alleging that "they would have moved for a mistrial and requested that the juror in question be replaced by an alternate juror" had the incident been disclosed to them during trial. *Smith* at 945. After hearing, the state trial judge denied the motion for new trial, finding there had been no juror misconduct or anything that would impeach the fairness of the verdict.

*Smith*, like the present case, involved the interplay of potential juror bias, prosecutorial misconduct, and the effect of the nondisclosure on the trial proceedings. Reasoning that the touchstone of due process is the fairness of the trial, not the culpability of the prosecutor, the Supreme Court held that the defendant had not been denied a fair trial because, in a post-trial, hearing the trial court determined that the juror had not lost the ability to consider the case solely on the evidence. In effect, no reversible error occurred despite the prosecutorial misconduct because the defendant had been tried before a fair and impartial jury.

The Court in *Smith* relied on *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). In *Remmer*, one of the jurors was approached during trial by an unnamed person who remarked that the juror could profit by bringing in a verdict favorable to the defendant. The juror informed the trial court, who informed the prosecutor, and the F.B.I. investigated the matter during trial. The defendant did not learn of the jury tampering until after trial. The defense attorney stated that had he known about the incident during trial, he would have moved for a mistrial and requested that the tainted juror be replaced by an alternate.

The Supreme Court ordered the trial court to conduct a hearing to determine whether the incident had influenced the juror. If the juror had not been influenced, no new trial was required.

■ Accordingly, the focus of our analysis in regard to Federal due process is whether the trial court erred in determin-

ing that juror Manual had not been influenced by the telephone threats.

Where a juror converses with an unauthorized person, injury to the accused is presumed. *Mayo v. State*, 708 S.W.2d 854 (Tex.Crim.App.1986). Harm is also presumed when an unauthorized person communicates with a juror even though the communication does not rise to the level of a conversation. *McIntire v. State*, 698 S.W.2d 652 (Tex.Crim.App.1985). The record in this case adequately demonstrates that the communications were about this case. Therefore, we presume harm and turn to the question of whether the State successfully rebutted the presumed harm. *See Mayo v. State*, 708 S.W.2d at 856.

In *Mayo*, a defense witness and a juror communicated, the witness asked the juror to be lenient in assessing punishment, and the jury assessed the death penalty. The Court of Criminal Appeals found that the State rebutted the presumption of harm because the witness' request was totally disregarded. *Mayo v. State*, 708 S.W.2d at 856.

In *Thomas v. State*, 699 S.W.2d 845 (Tex. Crim.App.1985), a juror was told that the defendant had killed two other men before the shooting which was the basis of the prosecution. The juror testified that he did not tell the other jurors about the incident, that he did not consider the statement, and that it did not affect his verdict. *Thomas v. State*, 699 S.W.2d at 853.

In *Romo v. State*, 631 S.W.2d 504 (Tex. Crim.App.1982), a juror was in an elevator with two police officers who said, "They're all guilty." The juror testified that the statements of the officers did not affect her ability to decide the case only on the evidence offered at trial. The Court found no error in failing to grant a new trial.

In *McMahon v. State*, 582 S.W.2d 786 (Tex.Crim.App.1978), a juror received a telephone call from an anonymous individual who offered to pay the juror five hundred dollars to "hang the jury." The juror reported the incident to the trial court,

discussed the incident with no one, and took no bribe. No reversible error occurred.

In the present case, juror Manual testified that she did not tell the other jurors about the telephone calls and that the calls did not affect her verdict. This testimony is evidence which rebuts the presumption of harm. Therefore, the trial court did not err in determining that appellant's punishment was assessed by a fair and impartial jury.

[4] Appellant did not raise in his motion for new trial or present at the new trial hearing any objection based on the constitutional provisions on which he now raises in his appellate brief. Generally, the failure to object in the trial court on the grounds raised on appeal will waive appellate consideration of the matters. *See Waldo v. State*, 746 S.W.2d 750, 752 n. 2 (Tex.Crim.App.1988); *Jackson v. State*, 745 S.W.2d 4, 5 n. 2 (Tex.Crim.App.1988); *Buxton v. State*, 699 S.W.2d 212, 217 (Tex. Crim.App.1985); *Wagner v. State*, 687 S.W. 2d 303, 306 (Tex.Crim.App.1984); *Beck v. State*, 682 S.W.2d 550, 553 n. 4 (Tex.Crim. App.1985); *Stevens v. State*, 667 S.W.2d 534, 538 (Tex.Crim.App.1984); *Parker v. State*, 649 S.W.2d 46, 54 n. 2 (Tex.Crim. App.1983); *Nelson v. State*, 607 S.W.2d 554, 555 (Tex.Crim.App.1980).

We also note that appellant raised both state and federal grounds in the same point of error. An appellant who briefs in this manner risks having points overruled as multifarious. *See McCambridge v. State*, 712 S.W.2d 499 (Tex.Crim.App.1986); *Dees v. State*, 722 S.W.2d 209 (Tex.App.–Corpus Christi 1986, pet. ref'd).

Assuming, however, that appellant properly and sufficiently objected at trial and presented constitutional grounds for appellate review, we find no reversible error in light of *Smith v. Phillips*.[3]

The El Paso Court of Appeals reached a similar result in a case where the prosecutor failed to report an incident of jury

---

3. Our research shows that Tex. Const. Art. 1, § 19 provides an accused the same protections

as the due process clauses of the 5th and 14th Amendments to the United States Constitution.

communication. *See Chambliss v. State,* 633 S.W.2d 678, 682 (Tex.App.–El Paso 1982). In affirming this decision, the Court of Criminal Appeals stated:

> Appellant's third ground of error asserts that the prosecutor should have been disqualified for not bringing Richards' conversation to the attention of the trial court. We think he should have notified the court rather than determine sua sponte that no misconduct occurred. The record does reveal, however, that he advised Mrs. Leak not to have any further contact with Richards. We do not see prosecutorial misconduct calling for a new trial, but express no opinion as to a possible violation of Disciplinary Rule 7–108(G) of the Code of Professional Responsibility.

*Chambliss v. State,* 647 S.W.2d 257, 266 (Tex.Crim.App.1983).

■ While no reversible error occurred in the present case, prosecutors are strongly advised to conform their conduct to the Code of Professional Responsibility.

Disciplinary Rule 7–108(G) provides:

> A lawyer shall reveal promptly to the court improper conduct by a venireman or a juror, or by another toward a venireman or a juror or a member of his family, of which the lawyer had knowledge.

The uncontroverted record in this case shows that the prosecutor violated DR 7–108(G). In its brief, the State writes:

> After receiving a guilty verdict in a difficult, week long, circumstantial evidence case, the State's attorney was presented a dilemma with potentially disastrous options through no fault of his own. He decided to risk that the juror had not been influenced, knowing the Rules of Appellate Procedure provided an opportunity to develop a record to determine if harm occurred. Tex.R.App. P. 30(b)(7). Further he stressed in his argument preceding the jury's deliberations on punishment the importance of deciding their verdict on only the evidence and disregarding anything they had heard or learned during their three days recess ... In an additional attempt to ameliorate the problem, appellant's trial attorney was advised the State would not oppose a change of election to allow the trial judge to assess punishment.

By "deciding to risk that the juror had not been influenced," the prosecutor decided to usurp the judicial function of the trial court. By secreting information of jury tampering from the trial court and the appellant, the prosecutor prevented a full inquiry into the matter when it would have been most appropriate, substituted his judgment for that of the trial court, violated DR 7–108(G), and ignored the Code of Criminal Procedure. For reasons stated above, however, appellant's seventh through tenth points of error are overruled.

### VOIR DIRE POINTS OF ERROR

In his eleventh, twelfth, and thirteenth points of error, appellant contends the trial court erred in sustaining the State's challenges for cause to veniremen Larry Murphy, Jane Dickens, and Gloria Morin. We initially summarize the testimony of each venireman because certain aspects of their testimony and apparent grounds for exclusion are common.

Juror Murphy testified that he would have a problem voting to convict because of religion, and that if the evidence showed appellant to be guilty, he could not enforce the law. When the State challenged the juror for cause, the trial court's further questioning revealed that Murphy would find it difficult to deprive somebody of his liberty. In response to appellant's questions, Murphy stated that he would find service extremely difficult and would rather not have to serve but, "[t]hat's not saying I can't do it." He then stated that he would follow the law if he had to serve, because he is obligated to.

The State then renewed its challenge and appellant objected because "he said he could follow the law."

Juror Jane Dickens testified that she knew appellant, her husband had grown up with him, and she had met him years ago. She stated that she and appellant each coached Little League teams. She stated

she would have a hard time being fair because of their relationship. When asked whether the friendship would influence her verdict, she testified that she couldn't say for sure. In response to appellant's questions, she stated that she would make an attempt to follow the court's instructions but did not know for sure whether she could.

In response to questions from the court, Dickens stated that she had heard "a lot of evidence against him," but "inside, I can't believe he did it ... I'm not sure I could believe it."

Juror Morin testified that she did not know about the case or appellant, but could not be fair. She stated that her husband and son were incarcerated in TDC, and that she had a negative feeling about the law which would prevent her from participating. In response to questions from appellant, juror Morin testified she would try her best to be fair, but would not promise. She then stated she would follow the judge's instructions.

In response to questions from the trial court, Morin testified that her son's incarceration would affect her verdict. She stated she could be fair in judging guilt, would consider sending appellant to the penitentiary, but "wouldn't be a good juror."

We initially determine that appellant has preserved his points for appellate review, despite his failure to lodge specific objections to the trial court's sustaining the State's challenges. Where the defendant complains on appeal that the trial court erred in sustaining a State's challenge for cause, the defendant must voice an objection to preserve error. *McCoy v. State,* 713 S.W.2d 940, 953 (Tex.Crim.App.1986). A general objection is sufficient to preserve error if it is clear from the record that the State, defense, and trial court knew the nature of appellant's objection. *McCoy v. State,* 713 S.W.2d at 953; *Roeder v. State,* 688 S.W.2d 856 (Tex.Crim.App. 1985). *See Miller v. State,* 741 S.W.2d 382 (Tex.Crim.App.1987). In this case, the grounds for objection are apparent.

In order to gain a reversal for the improper exclusion of a qualified juror, a defendant must show that the State exhausted its peremptory challenges, and that but for the trial court's actions, the juror would have served. *Goodman v. State,* 701 S.W. 2d 850 (Tex.Crim.App.1985); *Payton v. State* 572 S.W.2d 677 (Tex.Crim.App.1978). If the trial court erroneously excludes a qualified juror, then the State has in effect received the benefit of an additional peremptory strike. *Goodman,* 701 S.W.2d at 856.

In this case, the State used nine of its ten peremptory strikes. Therefore, to be entitled to relief, appellant would have to show that the trial court erroneously excluded more than one potential juror on State's challenges.

■ Juror Murphy equivocated on his ability to enforce the law and send someone to prison. A prospective juror may be challenged for cause if he or she has a bias against any of the law applicable to the case. *Phillips v. State,* 701 S.W.2d 875, 880 (Tex.Crim.App.1985).

The trial judge's determination that a potential juror is biased is a factual finding. *Clark v. State,* 717 S.W.2d 910 (Tex.Crim. App.1986). *See* Clark, Clinton, J., joining judgment, 717 S.W.2d at 920.

Given Murphy's equivocation, we cannot find that the trial court erred in determining his qualification for jury service. Appellant's eleventh point of error is overruled.

■ Juror Dickens testified that because of her relationship with appellant she would have a hard time being fair and was not sure she could believe appellant to be guilty, but would attempt to follow the court's instructions. In *Williams v. State,* 565 S.W.2d 63 (Tex.Crim.App.1978), a prospective juror was erroneously not excused where he admitted a prejudice against the defendant because of dissatisfaction with a well the defendant had once drilled for him, even though he stated he could disregard his prior association with the defendant and base his decision on the evidence and court's charge. While a trial court may

hold a juror qualified who states that he can lay aside any opinion which he may have formed, no such discretion vests in the court with reference to a juror with bias or prejudice toward an accused. *Williams v. State*, 565 S.W.2d at 65.

When bias or prejudice are not established as a matter of law, the trial court has discretion to determine whether bias or prejudice actually exists to such a degree that the prospective juror is disqualified and should be excused. *Anderson v. State*, 633 S.W.2d 851 (Tex.Crim.App.1982). *See Anderson*, 633 S.W.2d at 853, for the definition of "bias" and "prejudice." [For examples of where a defendant's challenge is overruled because juror says he can lay thoughts about punishment aside, *see Moore v. State*, 542 S.W.2d 664 (Tex.Crim. App.1976); *Simmons v. State*, 594 S.W.2d 760 (Tex.Crim.App.1980)].

Dickens had a bias toward the accused, not toward the law, a witness, or other aspect of the case. Dickens was properly excused. *See Noah v. State*, 495 S.W.2d 260 (Tex.Crim.App.1973). Appellant's twelfth point of error is overruled.

Juror Morin did not know appellant but had a bias against the law. Morin equivocated between not being fair, trying her best to be fair, and being able to follow the court's instructions. She stated that her son's incarceration in TDC would affect her verdict.

We also note that a juror's promise to "try" to follow the law is insufficient to overcome earlier statements that he could not. *Evert v. State*, 561 S.W.2d 489 (Tex. Crim.App.1978). *See McCary v. State* 477 S.W.2d 624 (Tex.Crim.App.1972) (juror would try to be fair but would probably be influenced because of similar situation in her own family). The trial court did not err in excusing juror Morin. Appellant's thirteenth point of error is overruled.

The judgment of the trial court is AFFIRMED.